**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

JAIME H. WEINBERG, ESQ.; BRADFORD J.
MINNICK; THOUSAND ISLANDS INN HOLDINGS,
LLC; and THOUSAND ISLANDS ENTERPRISES, LLC,          5:17-cv-00021 (BKS/ATB)

                               Plaintiffs,

v.

VILLAGE OF CLAYTON, NEW YORK; NORMA
ZIMMER, Mayor, Village of Clayton; BOARD OF
TRUSTEES OF THE VILLAGE OF CLAYTON, NEW
YORK; BRUCE BEATTIE; BEATTIE ENTERPRISES,
LLC; MENTER, RUDIN & TRIVELPIECE, PC; JOSEPH
RUSSELL, ESQ.; and RICHARD INGERSON, Code
Enforcement Officer,

                               Defendants.

---

**APPEARANCES:**

*For Plaintiffs:*
Jaime H. Weinberg, Esq.
Law Office of Jaime H. Weinberg, Esq.
20128 Carr Road Ext.
Wellesley Island, NY 13640

*For Defendants Village of Clayton, Norma Zimmer, Board of Trustees of the Village of Clayton,*
*Bruce Beattie, Beattie Enterprises, LLC, and Richard Ingerson:*
Molly M. Ryan, Esq.
Heather K. Zimmerman, Esq.
Goldberg Segalla LLP
5786 Widewaters Parkway
Syracuse, NY 13214

*For Defendants Menter, Rudin & Trivelpiece, P.C., and Joseph Russell, Esq.:*
Steven Ward Williams, Esq.
Karen G. Felter, Esq.
Smith Sovik Kendrick & Sugnet, P.C.
250 South Clinton Street, Suite 600
Syracuse, NY 13202

Hon. Brenda K. Sannes, United States District Judge:

MEMORANDUM-DECISION AND ORDER

## I.    INTRODUCTION

In this action, which arises out of events surrounding local enforcement actions against the owners of a historic inn, Plaintiffs Jaime H. Weinberg,[1] Bradford J. Minnick, Thousand Islands Inn Holdings, LLC ("TI Inn Holdings"), and Thousand Islands Enterprises, LLC ("TI Enterprises") allege violations of their federal constitutional rights and state law by Defendants Village of Clayton (the "Village"), the Board of Trustees of the Village (the "Village Board"), Village Mayor Norma Zimmer, Code Enforcement Officer Richard Ingerson, Bruce Beattie, and Beattie Enterprises, LLC (collectively, the "Clayton Defendants"), and by Defendants Menter, Rudin & Trivelpiece, P.C. ("Menter") and Joseph Russell (together with Menter, the "Menter Defendants"). (Dkt. No. 33, at 2–3). Plaintiffs' amended complaint (the "Complaint"), filed on March 31, 2017, seeks compensatory damages, punitive damages, and injunctive relief. (Dkt. No. 33, ¶ 214). On May 15, 2017, the Clayton and Menter Defendants separately moved to dismiss the Complaint. (Dkt. Nos. 50, 52). For the reasons discussed below, the Clayton Defendants' motion is denied in part and granted in part, and the Menter Defendants' motion is granted.

## II.    FACTS

### A.    December 2013 Purchase of the Inn and Spring 2014 Improvements

In late 2013, Plaintiffs Weinberg and Minnick moved from the Washington, D.C., area to the Thousand Islands, where Minnick was originally from. (Dkt. No. 33, ¶ 26). In December 2013, they acquired the Thousand Islands Inn (the "Inn"), a historic property located in the

---

[1] The Court notes that Plaintiff Weinberg represents himself and the other Plaintiffs. The docket does not indicate that a conflict waiver was filed.

Village of Clayton, New York, which had operated continually as a lodging, restaurant, and bar from the late nineteenth century until September 2013.[2] (*Id.* ¶¶ 12, 25, 26). Prior to the acquisition, the Village's Code Enforcement Office had inspected the Inn and deemed it safe. (*Id.* ¶ 27). Plaintiffs relied on documentation of these inspections and on certificates of occupancy posted on the Inn's walls, among other things, in deciding to purchase the Inn. (*Id.*). Before the acquisition, Defendant Code Enforcement Officer Ingerson told Weinberg that the Village would require only minor modifications to the building, such as the installation of "vertical members on the fire escape to prevent falls" and lighted exit signs, before the Inn could reopen. (*Id.* ¶ 28).

After taking possession, Plaintiffs began certain improvement work with the goal of reopening the Inn as a full-service hotel, restaurant, and bar around Memorial Day weekend 2014. (*Id.* ¶ 29). In the course of performing their work, Plaintiffs' contractors discovered that an exterior wall in the first-floor bar area had been compromised previously by the "substandard" installation of picture windows in 1973. (*Id.* ¶ 30). Plaintiffs' architect prepared plans to shore up the structural integrity of the bar area and basement, and consulted with Ingerson and the Village throughout the process. (*Id.* ¶ 31). Ingerson required Plaintiffs to obtain a building permit for this work, (*id.* ¶ 32), and the shoring work began in April 2014, (*id.* ¶ 33). Per Plaintiffs' technical sources, the shoring work made the building safer than it had been since 1973. (*Id.* ¶ 35).

### B.    Developments Between Summer 2014 and Summer 2015

In summer 2014, with the permission of Ingerson and the Village, Plaintiffs operated a take-out restaurant from a window in the Inn's rear kitchen area. (*Id.* ¶¶ 36, 87). Defendant

---

[2] According to the Complaint, the "Inn is where Thousand Islands Dressing . . . was originally served to the public, lending [sic] to its iconic status." (Dkt. No. 33, ¶ 25).

Beattie, an elected trustee on the Village Board, and Defendant Beattie Enterprises had an interest in three businesses that competed with (or that Beattie and his associates perceived as competing with) the Inn: (1) Attilio's Pizza, a restaurant operated by Beattie directly across the street from the Inn; (2) Channelside Restaurant, a restaurant operated by Beattie's wife located about 500 feet from the Inn; and (3) the Johnston House, a restaurant operated by Beattie's son about 580 feet from the Inn. (*Id.* ¶¶ 17, 86).

Beattie and his associates "harassed Plaintiffs" and "leveraged [Beattie's] official position to do so," including through "citizen complaints" leading to "multiple visits to the Inn by the Village of Clayton police" and "enforcement calls to the Inn from the New York State Departments of Health and Revenue." (*Id.* ¶ 87). Plaintiffs allege on information and belief that one of Beattie's associates told Gabe Aubertine, TI Enterprises' chef at the time, that he "better tell his bosses to watch out." (*Id.* ¶ 89). Later, a Channelside Restaurant employee told Weinberg not to walk by the restaurant because Beattie "owns the sidewalk." (*Id.*). Additionally, when Plaintiffs sought relief related to their water bill at a Village Board meeting, Beattie warned them that they better "go along to get along."[3] (*Id.*). Weinberg wrote to Beattie demanding that he and his associates "cease and desist their harassment." (*Id.* ¶ 88).

Since acquiring the Inn, Plaintiffs have only opened the building to the public once, in September 2014, during the Clayton Jazz Fest for "a free, one-night, 'taste' of the Inn's future singalong piano bar." (*Id.* ¶¶ 36, 96). Ingerson told Weinberg he "was not allowed to have people in the building because of potential liability to the Village," but Weinberg "consulted with legal counsel and confirmed" that there was no "legal basis for this contention." (*Id.* ¶ 96). The event

---

[3] Plaintiff alleges upon information and belief that Beattie had "desired a $225,000 New York State Main Street Anchor Grant," which was "eventually awarded to Plaintiffs," and that, in connection with the water bill request, Beattie "snapped something to the effect of: 'We got you a grant, what more do you want?'" (Dkt. No. 33, ¶ 90).

was held and attended by Defendant Zimmer, the Mayor of Clayton. (*Id.*). Weinberg believes

that, from that point on, Ingerson viewed Weinberg "as thumbing his nose" at his authority. (*Id.*).

In October 2014, Plaintiffs planned to hold a "Haunted Hotel" charity event, but Ingerson

told Weinberg that he could not have people in the Inn because of the liability risk. (*Id.* ¶ 97).

Although Weinberg "confirmed" with counsel that there was no legal basis for this contention,

Plaintiffs canceled the event and "communicated their disappointment" by placing a message on

their marquee stating "Haunted Hotel Cancelled Due to Nanny State." (*Id.*). Plaintiffs allege on

information and belief that Ingerson and Code Enforcement Specialist Edward Fry[4] were "highly

agitated and embarrassed" by this sign, the posting of a picture of that sign on the Facebook

pages of Weinberg, Minnick, and the Inn, and Weinberg's challenge to Ingerson's "perceived

authority." (*Id.* ¶ 165). Further, Plaintiffs "have reason to believe" that Ingerson and Fry

"determined to find some pretext upon which to 'get' the outspoken" Weinberg in retaliation for

this speech. (*Id.*).

On June 22, 2015, Weinberg was admitted to the New York Bar. (*Id.* ¶ 171). Minnick and

TI Enterprises employees put up "a temporary celebratory and congratulatory banner on the front

porch of the Inn," but Ingerson demanded that Weinberg remove the banner. (*Id.*). Weinberg said

he would remove it "in short order" because the banner was temporary and "not because of

[Ingerson's] order." (*Id.*). Weinberg then spoke to Zimmer, asking her to have Ingerson "leave

Weinberg and TI Inn businesses alone, lest [Weinberg] take legal action" against Ingerson and

the Village. (*Id.*). Plaintiffs "have reason to believe" that subsequent events, described below,

were "in part in retaliation for the erection [of the] celebratory banner." (*Id.*).

---

[4] According to the parties' so-ordered stipulation of dismissal, Fry has died and has been dismissed as a Defendant in this action. (Dkt. No. 68).

### C.    First Unsafe Declaration, Notice of Violation, and Appearance Ticket

In late June 2015, Plaintiffs gave permission to the Inn's cook (an employee of TI Enterprises) to stay overnight at the Inn in preparation for activities over Independence Day weekend. (*Id.* ¶ 38). They discussed the cook's planned presence with the Village's Chief of Police, who expressed no objection and even supported the idea as the cook could "keep an eye on the place." (*Id.* ¶ 39). On the morning of July 2, 2015, as Weinberg arrived at the Inn, he noticed that Ingerson, Fry, and Kimberly Johnston[5] were "hanging around across the street from the Inn's take-out window, which seemed unusual." (*Id.* ¶ 40). A TI Enterprises employee then reported to Weinberg that Weinberg's friend, "who works for the town," had come to the take-out window to warn Plaintiffs that Ingerson and others were "up to something" regarding the Inn. (*Id.* ¶ 41). Later that day, that municipal employee sent Weinberg a private Facebook message, stating, "When I left, it sounded like something bad was going to go down, I assumed at the TI Inn." (*Id.*). In a subsequent private Facebook message on July 6, 2015, the employee messaged Weinberg that, on July 2, 2015, he had "heard . . . Richard, Kim and the county/state guy decided you guys had pushed the envelope too far too many times," adding, "I believe you know the main reason, but at dept head meeting today, told not to talk about this, since it's going to court." (*Id.*).

Shortly after Weinberg's arrival at the Inn, Ingerson came up to the take-out window and asked Minnick if Plaintiffs "had someone living at the Inn," which Minnick denied. (*Id.* ¶ 42). Weinberg then met with Ingerson, Fry, and Johnston outside, and he sensed that Fry and Johnston were there to witness "whatever was to happen next, and to attempt to intimidate" him.

---

[5] Johnston is not a Defendant; the Amended Complaint does not indicate Johnston's relationship, if any, to the parties in this case.

(*Id.*). Ingerson and Fry "aggressively confronted" Weinberg, telling him that there had been a citizen complaint that someone was "living at the Inn," and showing him a photo of a light in one of the Inn's windows, which had been taken the previous night from the perspective of Attilio's Pizza, a restaurant across the street operated by Defendants Beattie or Beattie Enterprises. (*Id.* ¶ 43). Although Ingerson initially refused to identify the citizen complainant, Ingerson eventually indicated, while facing toward and looking at Attilio's, that the complainant was "a business owner across the street." (*Id.*). Weinberg admitted that he had authorized the Inn's cook to "crash" at the Inn the night before, and Ingerson ordered Weinberg to eject the cook immediately. (*Id.* ¶ 44). Weinberg refused to do so, given the source of the citizen complaint, as well as Ingerson's and Fry's inability to "articulate a sensible legal basis for their belief" that the cook's presence overnight was illegal. (*Id.*). Weinberg also informed Ingerson that the Chief of Police had not objected to the cook's "crashing" at the Inn, to which Ingerson responded, "It's my jurisdiction, not his." (*Id.*). Fry then told Ingerson to "take [Weinberg] to court."[6] (*Id.*).

Within hours of this confrontation, Ingerson "declared and posted the Inn as unsafe and unfit for human habitation, ordering it vacated and not to be used or occupied" (the "First Unsafe Declaration"). (*Id.* ¶ 47). But Ingerson "did not provide notice of, or an opportunity to cure, any specific defects, nor did he perform an inspection, nor did he issue a report" in connection with the First Unsafe Declaration. (*Id.*). Further, prior to the First Unsafe Declaration, Ingerson had never indicated that "the dining room or guest rooms of the Inn were unsafe or unfit for human habitation."[7] (*Id.* ¶ 37). Additionally, Ingerson issued a notice of violation and "leveled a single,

---

[6] Plaintiff states on information and belief that Ingerson relied on Fry when Ingerson was "unsure of how to proceed with his duties." (Dkt. No. 33, ¶ 46).

[7] Plaintiffs further allege upon information and belief that Ingerson allowed his brother to "live at the Inn (without any Plaintiffs' permission) while construction of the shoring and other contracted work was actually occurring." (Dkt. No. 33, ¶ 37 (emphasis omitted)).

cryptic, criminal charge"—violation of "Town of Clayton Local Law #2, paragraph 7(a)"

("Local Law No. 2")[8]—against Weinberg through an appearance ticket (the "First Appearance

Ticket") "in the name of the Town of Clayton." (Dkt. No. 33, ¶¶ 47, 49 (emphasis omitted)).

On July 7, 2015, Weinstein appeared[9] in Clayton Municipal Court in connection with the

First Appearance Ticket. (*Id.* ¶ 48). Ingerson and Fry appeared on the Town of Clayton's behalf.

(*Id.*). Weinberg was "prepared to move to dismiss," but Ingerson and Fry told the court that they

"just wanted the [cook] out," and the court adjourned the proceeding until July 13, 2015. (*Id.*

¶ 52).

On July 8, 2015, TI Inn Holdings requested a hearing before the Board of Trustees of the

Town of Clayton pursuant to section 9(b) of Local Law No. 2, under which an owner served with

a notice that a building is unsafe may request, within 30 days of service of such notice, "a

hearing before the Town Board to consider the validity of the determination made by the Code

Enforcement Officer." (*Id.* ¶ 81 (quoting Town of Clayton Local Law No. 2 of 2008, § 9(b)(3))).

The request was denied on July 14, 2015 because it had "nothing to do with the Town of Clayton

or any approvals thereof." (*Id.* ¶ 82).[10]

---

[8] Plaintiff appears to be referring to—and the Court takes judicial notice of—the "local law providing for the administration and enforcement of the New York State Uniform Fire Prevention and Building Code" enacted in 2008. *See* Town of Clayton Local Law No. 2 of 2008, https://locallaws.dos.ny.gov/sites/default/files/drop_laws_here /ECMMDIS_appid_DOS20150218075530_36/Content/090213438000d8bf.pdf. *See Missere v. Gross*, 826 F. Supp. 2d 542, 553 (S.D.N.Y. 2011) (taking judicial notice of documents in the public record, including village zoning code, in deciding a motion to dismiss under Fed. R. P. 12(b)(6)). Paragraph 7(a) of Local Law No. 2, which describes the requirements for a certificate of occupancy, states that "[p]ermission to use or occupy a building or structure, or portion therefor, for which a Building Permit was previously issued shall be granted only by issuance of a Certificates of Occupancy or Certificates of Compliance."

[9] According to the Complaint, this appearance was "Weinberg's putative arraignment." (Dkt. No. 33, ¶ 48).

[10] According to Plaintiffs, the "matter had been transitioned to the jurisdiction of the Defendant Village [i.e., from that of the Town of Clayton], as of July 13, 2015." (Dkt. No. 33, ¶ 82).

### D.    Second Unsafe Declaration, Notice of Violation, and Appearance Ticket

According to Defendant Menter's legal bills, which Plaintiffs obtained under New York's Freedom of Information Law, Defendant Village Attorney Russell conferred with Fry about the unsafe building matter on July 10, 2015, (*id.* ¶ 53), and with Ingerson about "TI Inn violations" on July 13, 2015, (*id.* ¶ 54). On July 13, 2015, Russell "personally revised, or caused the revision and the reissuance of the Appearance Ticket in the name of the Village of Clayton, such that the purported violation referenced the Village Code instead of Town of Clayton Local Law"— specifically section 70-7(A) of the Code of the Village of Clayton (the "Village Code") governing the requirements for a certificate of occupancy.[11] (Dkt. No. 33, ¶ 55). Plaintiffs allege on information and belief that, on July 13, 2015, Russell "caused" Ingerson to: (1) "post a second declaration of the Inn as unsafe and unfit for human habitation, ordering it to be vacated and not to be used or occupied" (the "Second Unsafe Declaration"), with references to the Village of Clayton substituted for references to the Town of Clayton; and (2) issue a second appearance ticket (the "Second Appearance Ticket") with a second notice of violation. (*Id.* ¶ 57). Plaintiffs also allege on information and belief that Russell "unilaterally caused the further adjournment of Weinberg's arraignment until July 23, 2015." (*Id.*).

Weinberg was arraigned on July 23, 2015 on the single charge of violating certificate of occupancy requirements at the Inn by allowing a TI Enterprises employee to stay in a residential room overnight on July 1, 2015. (*Id.* ¶ 60). At the arraignment, Weinberg attempted to engage Russell, pointing out "defects in the criminal complaint," but Russell said, "My orders are to

---

[11] The Court takes judicial notice of the Village Code. *See Village of Clayton, NY*, eCode360.com, https://www.ecode360.com/CL0983.

prosecute you, and so I'm going to prosecute you." (*Id.* ¶ 61). Weinberg indicated he would file a

motion to dismiss returnable on September 17, 2015. (*Id.* ¶ 62).

Immediately after the arraignment, Ingerson began a "24x7 photographic surveillance" of

the Inn, which lasted for 72 days. (*Id.* ¶ 99). At times, Ingerson "plac[ed] the camera on privately

leased property without permission of the tenants and without a warrant," and, at times, he

"peer[ed] into hotel room windows." (*Id.*). Plaintiffs allege on information and belief that the

surveillance "was intended to 'catch' Plaintiffs' cook 'living at the Inn.'" (*Id.* ¶ 182).

On July 29, 2015, TI Inn Holdings requested a hearing before the Village Board pursuant

to section 70-9(B)(3), which provides that an owner served with a notice that a building is unsafe

may request, within 30 days of service of such notice, "a hearing before the Village Board of

Trustees to consider the validity of the determination made by the Code Enforcement Officer."

(*Id.* ¶¶ 81, 83 (quoting Village of Clayton Code § 70-9(B)(3))). The Village denied the request

on August 7, 2015, stating that "there is no basis for a hearing before the Village Board based on

the issuance of a letter of violation and/or a notice to vacate and/or an appearance ticket for

violating Certificate of Occupancy requirements pursuant to Chapter 70 of the Code." (*Id.* ¶ 83).

### E.    Third Unsafe Declaration and Notice of Violation

As early as July 24, 2015, "Defendants undertook to construct an entirely new case

against Plaintiffs." (*Id.* ¶ 63). Based on Menter's legal bills, Plaintiff infers that Defendant

Zimmer and Russell "agreed, at least as of July 29, 2015, not only to continue the preexisting

prosecution of [Weinberg], but to develop whatever pretexts and authorities necessary to 'throw

the book' at Plaintiffs, to 'wear down' Plaintiffs, and to gain concessions from Plaintiffs." (*Id.*

¶ 113). On August 6, 2015, Menter associate Nicole Intschert obtained "a letter of authority to

prosecute local laws and ordinances" from her mother, Cynthia Intschert, who at the time was

serving as the district attorney. (Dkt. No. 33, ¶ 106). On August 10, 2015, the Village Board

adopted a resolution, prepared by Russell, which authorized "the civil and criminal prosecution of Plaintiffs for purported violation of certificate of occupancy requirements connected with the allegation that the Inn's cook was living" at the Inn. (*Id.*). Beattie, who served on the Village Board, "seconded a motion to adopt, voted to adopt, and failed to recuse himself from participating in consideration" of the resolution. (*Id.*).

On August 20, 2015, Ingerson "once again posted the Inn as unsafe and unfit for habitation and ordered it vacated and not to be used or occupied" (the "Third Unsafe Declaration").[12] (*Id.* ¶ 65). On the same day, Weinberg and TI Inn Holdings were served with a combined notice of violation and compliance order (the "Combined Notice"), which alleged "misdemeanors involving a multiplicity of *state-level* Uniform Code and fire and safety code violations related to the purported absence of smoke detectors and fire suppression systems," ordered Plaintiffs to vacate the premises within 10 days, and ordered that a full building sprinkler system be installed within 30 days. (*Id.*). According to Plaintiffs, the Third Unsafe Declaration and the Combined Notice were issued despite the lack of any inspection or report and misrepresented Plaintiffs' sprinkler system variance requests and level of construction performed at the Inn up until then. (*Id.* ¶¶ 66, 100).

## F.    Criminal Prosecution and Civil Actions

Before the deadline for complying with the Combined Notice had expired, the Village, Ingerson, Fry, Russell, and Menter commenced three "simultaneous" legal proceedings against

---

[12] Plaintiffs do not allege that they sought a hearing before the Village Board to contest the validity of the Third Unsafe Declaration. (Dkt. No. 33, ¶ 85). Further, Plaintiffs claim that they could not commence a judicial review proceeding in state court under Article 78 of the New York Civil Practice Law and Rules (the "CPLR") because Ingerson's determination "was before more than one court that could adequately review the question." (*Id.* (citing N.Y. C.P.L.R. 7801)).

Weinberg and TI Inn Holdings: (1) a criminal proceeding in Clayton Village Court[13] charging them with 22 criminal misdemeanor counts under section 382(2) of the New York Executive Law[14] for violating a "lawful order" of the Village and provisions of the New York State Uniform Fire and Building Code (the "Uniform Code"); (2) a civil action in New York Supreme Court, Jefferson County, filed on September 2, 2015, asserting 22 claims against them for "alleged failure to comply" with the Uniform Code; and (3) an order to show cause seeking injunctive relief and requiring a response by September 17, 2015.[15] (*Id.* ¶¶ 68, 84, 119). Defendant took "steps to further increase the pain and inconvenience to Plaintiffs" by serving the order to show cause and civil complaint at 5 p.m. on Friday, September 4, 2015, before Labor Day weekend, timing the arraignment on September 8, 2015, immediately after Labor Day weekend, requesting an expedited response to the order to show cause, and making all charges and claims retroactive to spring 2014 with penalties of up to $1000 per day and threats of incarceration. (*Id.* ¶ 69). On September 1, 2015, Plaintiffs gave Zimmer an eight-page letter "begging for her to intercede before the matter escalated any further," but to no avail. (*Id.* ¶ 67).

On September 8, 2015, the date of the arraignment, Weinberg and TI Inn Holdings filed a motion to adjourn in contemplation of dismissal in the criminal case. (*Id.* ¶ 70). Subsequently, Weinberg and TI Inn Holdings corresponded with the Village's attorneys and made a settlement

---

[13] The Complaint alleges that the charges were brought in "the pending case" before the Clayton Village Court and notified to Plaintiffs through a third appearance ticket (the "Third Appearance Ticket") and superseding information dated August 27, 2015. (Dkt. No. 33, ¶¶ 68, 84).

[14] Plaintiff alleges, however, that "the District Attorney did not delegate the authority to prosecute alleged violations of unclassified misdemeanor offenses under Section 382(2) of the Executive Law to any Menter Attorney until April 25, 2016, nearly nine months after initiating the prosecutions on these misdemeanors in September, 2015." (Dkt. No. 33, ¶ 106). "On April 25, 2016, then- and current District Attorney Kristyna Mills issued a new letter at Attorney Intschert's request," which delegated prosecutorial authority retroactively as of August 6, 2015. (*Id.* ¶ 108).

[15] Although Plaintiffs at times describe the "injunction matter" as if it were a separate action, (Dkt. No. 33, ¶¶ 68, 77, 84, 85), it is apparent that the order to show cause was brought as part of the aforementioned civil action in New York Supreme Court, (*see id.* ¶ 76 (noting that "the judge in the civil matter in Supreme Court, Jefferson County, ordered and calendared oral argument regarding the pending injunction claim")).

offer, which was "immediately rejected." (*Id.* ¶¶ 71–74). In late October 2015, the judge in the civil case scheduled oral argument on the injunction request. (*Id.* ¶ 76). Shortly after, the "Village/People" approached counsel for Weinberg and TI Inn Holdings seeking to "stipulate to dismissal of the injunction matter," and "the parties began 'global settlement' discussions to resolve both the criminal and civil litigations." (*Id.* ¶ 77).

On January 6, 2016, the Clayton Village Court dismissed the criminal charges against Weinberg because he was "an improper defendant from the start." (*Id.* ¶ 78). On August 10, 2016, approximately a month before the start of the criminal trial against TI Inn Holdings, the Village sent a letter to the Clayton Village Court offering an "Adjournment in Contemplation of Dismissal (ACD) in the Interest of Justice," to which TI Inn Holdings agreed. (*Id.* ¶ 79). The criminal case was ordered adjourned in contemplation on September 6, 2016. (*Id.*). The civil action, however, remained pending in New York Supreme Court. (*Id.* ¶ 80).

### G.    Out-of-Court Developments from September 2015 to December 2016

A day after Weinberg's arraignment, Weinberg's municipal employee friend—who, as described above, had alerted Plaintiffs of Ingerson's impending actions against the Inn in early July 2015—sent Weinberg a Facebook message on September 9, 2015: "They do not speak kindly[] of you, being gay either. At least R[ichard Ingerson]." (*Id.* ¶ 41 (alterations in original)).

On September 14, 2015, during the public comment portion of a regular Village Board meeting, Minnick made a statement and asked questions of the Board.[16] (*Id.* ¶¶ 93, 123). On that occasion, Zimmer "silenced" Beattie, "saying [something] to the effect of: 'Shut up Bruce, you'll just dig yourself deeper.'" (*Id.* ¶ 93).

---

[16] The Complaint does not specify exactly what issues Minnick addressed, but it appears that his statement was related to issues raised by the pending litigation against Weinberg and TI Inn Holdings. (*See* Dkt. No. 33, ¶ 123).

On September 24, 2015, Menter sent a letter to Plaintiffs' counsel concerning a planned second annual "Jazz Fest" event at the Inn. (*Id.* ¶ 125). The letter stated: "The Village of Clayton has been informed that should the event take place inside any portion of the Inn, New York State will require the Village of Clayton Code Enforcement Office to condemn the entire building." (*Id.*). Plaintiffs allege, however, that they never intended to hold the event inside the Inn and were actually in the process of erecting an outdoor tent when they received the letter. (*Id.*).

Approximately a month later, on October 25, 2015, Beattie approached Weinberg after a regular Village Board meeting and asked, "What do I have to do to get out of this?" (*Id.* ¶ 94). Weinberg responded that Beattie should obtain counsel. (*Id.*). Beattie said there was no citizen complaint and that he had taken pictures at Ingerson's request. (*Id.*). He added that he previously worked for the Internal Revenue Service and could have given Plaintiffs "a really hard time" if he wanted to. (*Id.*).

After the cost of the litigation became public, Minnick published an "infographic" on his personal Facebook page "presenting certain details of the case that were embarrassing" to the Village, including the cost to the taxpayer and Ingerson's surveillance of Plaintiffs. (*Id.* ¶ 166). Menter accused Plaintiffs on February 27, 2016 of running a "vituperative social media campaign." (*Id.* ¶ 168).

On March 9, 2016, citing an anonymous source in the restaurant industry, the *Watertown Daily Times* published an article that revealed that the Inn's cook was a low-level sex offender. (*Id.* ¶ 91). Plaintiffs allegedly have reason to believe that the source was Beattie or one of his associates, and that "the leak was intended to smear [Weinberg and Minnick], who are gay with one of the oldest tricks in the book." (*Id.*). Menter attempted to obtain records on the cook from the Jefferson County Probation and Sheriff's Departments, apparently to no avail. (*Id.* ¶ 126).

As public scrutiny of the litigation increased, Russell "provided misleading and defamatory public statements about the case and about Plaintiffs" for Zimmer, with the intent to "place the blame of the mounting costs . . . on Plaintiffs." (*Id.* ¶ 127). More specifically, Plaintiffs take issue with Zimmer's publication of the public minutes of the September 12, 2016 meeting of the Village Board, which stated that the legal fees for the litigation were "a necessary expense for the case; a settlement was offered, but the defendants chose to go to trial, then agreed to settle on a previous offer, receiving a conditional discharge. If no further violations occur in the next year, the case will be dropped." (*Id.* ¶ 201).

Minnick repeatedly attempted to discuss the litigation at Village Board meetings. (*Id.* ¶ 169). On one occasion, as Minnick attempted to address the Village Board, Zimmer exclaimed, "Go ahead and rant, Brad. You always loved the stage." (*Id.* ¶ 133). When Minnick asked Zimmer to explain the public purpose for the litigation, she said that "he [the cook] was a sex offender!"—a statement that caused "audible gasps and shocked murmuring among the attendees." (*Id.* (alteration in original)). The Village Board and Zimmer introduced new rules for public comment at Village Board meetings, providing that no comment would be made or heard on pending litigation. (*Id.* ¶ 128). Zimmer, however, did not refrain from commenting on litigation when Plaintiffs were absent. (*Id.* ¶ 128). At one meeting, Zimmer "asked the Clayton Chief of Police to stay after his report (which he ordinarily did not do), on information and belief because [Minnick and Weinberg] had arrived." (*Id.* ¶ 169). At a subsequent meeting, Zimmer ordered the Clayton Police Chief to rise to silence Minnick as he attempted to address the Village Board. (*Id.* ¶¶ 128, 169).

While the litigation was ongoing, Zimmer "falsely accused" Minnick of physical abuse against Weinberg, triggering an investigation by a social worker and causing "distress and

mortification" to Minnick and Weinberg. (*Id.* ¶ 133). The accusation "drove [Minnick] to the brink of suicide." (*Id.* ¶ 204). The Complaint alleges adverse effects from the litigation and resulting developments, including, among others, "extreme and profound emotional distress, accompanied by physical manifestations," ostracizing by their friends and neighbors, Weinberg's inability to work on his "incipient law practice," financial distress, and a "freeze on activities" at and improvements to the Inn. (*Id.* ¶¶ 135–140).

### H.   Notice of Claim

Plaintiffs filed a notice of claim against the Village, Zimmer, Beattie, Ingerson, and Russell on December 5, 2016. (*Id.* ¶ 6). Subsequently, Beattie approached Minnick after a Village Board meeting, shook Minnick's hand, and told Minnick that he "would write" Minnick "a check right now" if he "had the money." (*Id.* ¶ 95).

## III.   STANDARD OF REVIEW

To survive a pre-answer motion to dismiss for failure to state a claim, "a complaint must provide 'enough facts to state a claim to relief that is plausible on its face.'" *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Although a complaint need not contain detailed factual allegations, it may not rest on mere labels, conclusions, or a formulaic recitation of the elements of the cause of action, and the factual allegations 'must be enough to raise a right to relief above the speculative level.'" *Lawton-Bowles v. City of New York*, No. 16-cv-4240, 2017 WL 4250513, at *2 (S.D.N.Y. Sept. 22, 2017) (quoting *Twombly*, 550 U.S. at 555). The Court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *See EEOC v. Port Auth.*, 768 F.3d 247, 253 (2d Cir. 2014) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)). When deciding a motion to dismiss, the Court's review is ordinarily limited to "the facts as asserted within the four corners

16

of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *See McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). The Court may also consider "any document not incorporated but that is, nevertheless, 'integral' to the complaint because the complaint 'relies heavily upon its terms and effect.'" *See Yung v. Lee*, 432 F.3d 142, 146 (2d Cir. 2005) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)).

## IV.    DISCUSSION

### A.    Federal Claims Against the Menter Defendants

Plaintiff asserts five federal claims under § 1983 against the Menter Defendants: (1) procedural due process under the Fourteenth Amendment; (2) substantive due process under the Fourteenth Amendment; (3) retaliation for and suppression of speech under the First Amendment; (4) double jeopardy under the Fifth Amendment; and (5) unreasonable search and seizure in violation of the Fourth Amendment.[17] (Dkt. No. 33, ¶¶ 141). As discussed below, all the federal claims against the Menter Defendants must be dismissed.

### 1.    Prosecutorial Immunity

Most of the Complaint's allegations against the Menter Defendants concern their involvement in the civil and criminal prosecution of Plaintiffs on behalf of the Village or the People. (*See* Dkt. No. 33, ¶¶ 101–123, 126, 129–132, 134, 147, 148, 183). The Menter Defendants move to dismiss the federal claims against them to the extent such claims rest on their prosecuting role. (*See* Dkt. No. 52-1, at 19–25, 28–29, 35, 38). Plaintiffs counter that the

---

[17] The First Amendment's guarantee of freedom of speech, the Fourth Amendment's right against unreasonable search and seizure, and the Fifth Amendment's prohibition against double jeopardy are incorporated into the Fourteenth Amendment's Due Process Clause and thereby applicable to the states. *See Benton v. Maryland*, 395 U.S. 784, 794 (1969) (double jeopardy); *Mapp v. Ohio*, 367 U.S. 643, 650 (1961) (unreasonable search and seizure); *Gitlow v. New York*, 268 U.S. 652, 666 (1925) (free speech).

Menter Defendants' "role as prosecutors in the underlying criminal prosecution . . . is completely irrelevant" to Plaintiffs' due process claims because Russell did not only act in a prosecuting role but also "as the Village's organizational and government counsel." (Dkt. No. 55, at 12, 16 (emphasis omitted)). Further, in response to the Menter Defendants' immunity defense as to the double jeopardy claim, Plaintiffs contend that immunity does not attach because the Menter Defendants were "not public prosecutors, and are not even really government attorneys." (*Id.* at 18). Plaintiffs add that their claims are not barred to the extent they seek injunctive relief, as opposed to money damages. (*Id.* at 12, 18).

"[I]n initiating a prosecution and in presenting the State's case, the prosecutor is immune from a civil suit for damages under § 1983." *Imbler v. Pachtman*, 424 U.S. 409, 431 (1976). The Second Circuit has made clear that prosecutors acting in an advocative role within the scope of their duties enjoy absolute immunity from §1983 suits, even if the prosecution was malicious:

> A defendant engaged in advocative functions will be denied absolute immunity only if he acts "without any colorable claim of authority." The appropriate inquiry, thus, is not whether authorized acts are performed with a good or bad *motive*, but whether the *acts* at issue are beyond the prosecutor's authority. Accordingly, where a prosecutor is sued under § 1983 for unconstitutional abuse of his discretion to initiate prosecutions, a court will begin by considering whether relevant statutes authorize prosecution for the charged conduct. If they do not, absolute immunity must be denied.

*Bernard v. County of Suffolk*, 356 F.3d 495, 504 (2d Cir. 2004) (citations omitted). Absolute immunity covers "conduct of prosecutors that was 'intimately associated with the judicial phase of the criminal process,'" *id.* at 270 (quoting *Imbler*, 424 U.S. at 430), "but not to a prosecutor's acts of investigation or administration," *Dory v. Ryan*, 25 F.3d 81, 83 (2d Cir. 1994), which are "protected only by qualified, rather than absolute, immunity," *Kalina v. Fletcher*, 522 U.S. 118, 126 (1997). Absolute immunity also protects "officials performing certain functions analogous to those of a prosecutor," *Butz v. Economou*, 438 U.S. 478, 515 (1978), including local executive

officers and government attorneys, whether the enforcement proceedings they prosecute is civil or criminal in nature, *see Spear v. Town of W. Hartford*, 954 F.2d 63, 66 (2d Cir. 1992) ("[W]hen a high executive officer of a municipality authorizes a civil lawsuit in pursuit of that municipality's governmental interests, absolute immunity attaches.").

In this case, Plaintiffs' prosecution was authorized by the "relevant statutes." *Bernard*, 356 F.3d at 504. The Complaint states that, after the Menter Defendants first became involved on July 10, 2015, they caused the revision and issuance of a second appearance ticket and the adjournment of Weinberg's arraignment until July 23, 2015, and charged him on that date with a single violation of certificate of occupancy requirements under section 70-7(A) of the Village Code. (Dkt. No. 33, ¶¶ 53, 55). Although the Village Code itself does not provide for criminal prosecution of Village Code violations, it specifies that its remedies are "not exclusive" and do not displace penalties under state law. *See* Village of Clayton Code § 70-15(E). Section 20-2006 of the New York Village Law permits a village board, under certain conditions, to adopt a resolution empowering a village attorney to prosecute violations of local law, and section 382(2) of the New York Executive Law provides penalties for violations of "applicable provisions of the uniform code or any lawful order of a local government." Based on these provisions, the Court cannot conclude that the Menter Defendants acted in the "clear absence of all jurisdiction" or "without any colorable claim of authority." *Barr v. Abrams*, 810 F.2d 358, 361 (2d Cir. 1987) (rejecting argument that "a prosecutor initiating a prosecution loses the protection of *Imbler* where state law did not empower the prosecutor to bring the charges"). Furthermore, on August 20, 2015, Weinberg and TI Inn Holdings were ultimately charged not with violation of the Village Code but with violations of a "lawful order" of the Village of Clayton and violations of

the Uniform Code. (Dkt. No. 33, ¶¶ 106–108). There is no question that the "relevant statute[]," N.Y. Exec. Law § 382(2), authorizes prosecution of these offenses.

Nevertheless, Plaintiffs assert that the Menter Defendants were not authorized public prosecutors under New York law. They note that the then district attorney did not delegate authority to the Menter Defendants to prosecute local laws and ordinances until August 6, 2015. (*Id.* ¶ 106). And although the Menter Defendants, on August 20, 2015, charged Weinberg and TI Inn Holdings with 22 criminal misdemeanor counts under N.Y. Exec. Law § 382(2), they allegedly did not have the authority at that time to prosecute misdemeanor offenses—such authority was retroactively delegated by the district attorney (unlawfully, according to Plaintiffs) on April 25, 2016. (*Id.* ¶¶ 106–108).

For purposes of prosecutorial immunity under § 1983—a question of federal law—the question is whether the Menter Defendants' conduct was functionally prosecutorial, not whether they had a proper delegation of prosecutorial authority under state law. *See Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993) (explaining that courts must use a "'functional approach,' which looks to 'the nature of the function performed, not the identity of the actor who performed it,'" to determine whether an officer's actions are absolutely immune from § 1983 liability (first quoting *Burns v. Reed*, 500 U.S. 478, 486 (1991), then quoting *Forrester v. White*, 484 U.S. 219, 229 (1988))). In *Verbeek v. Teller*, the plaintiff alleged that the village attorney brought "fabricated" charged against him, initially without the village board's permission. 158 F. Supp. 2d 267, 281 (E.D.N.Y. 2001). The court determined that the act of bringing charges against the plaintiff "was a prosecutorial function involving the initiation of a prosecution, performed by [the defendant] in his role as counsel appointed by the Village to 'prosecute'

disciplinary charges"; as a result, the court concluded that the village attorney was entitled to absolute immunity. *See id.*

Similarly, here, the Complaint is clear that the Menter Defendants had a prosecutorial role in both the civil enforcement and the criminal proceedings against Weinberg and TI Inn Holdings. Among other things, Russell discussed "the continued prosecution of plaintiff Weinberg" on July 10, 2015, (Dkt. No. 33, ¶53), worked on a second appearance ticket, (*id.* ¶ 56), caused the adjournment of Weinberg's arraignment, (*id.* ¶ 57), "appeared to prosecute" Weinberg at his July 23, 2015 arraignment, (*id.* ¶¶ 60, 61), and prepared a resolution "authorizing the civil and criminal prosecution" of Plaintiffs, which the Village Board adopted (*id.* ¶ 63). The Menter Defendants "initiated the civil actions and filed the Superseding Information in the criminal case" in August 2015, and then litigated those cases with apparent authorization from the district attorney. (*Id.* ¶¶ 64–80). Further, Plaintiffs do not allege that the Menter Defendants were engaged in any investigative or administrative actions not "intimately associated" with the prosecution of those cases. *Imbler*, 424 U.S. at 430. Although Plaintiffs contend that Russell acted "as the Village's organizational and government counsel," (Dkt. No. 55, at 12 (emphasis omitted)), they cite passages of the Complaint that refer to Russell's role in the prosecution of the cases, (*id.* (citing Dkt. No. 33, ¶¶ 53–61, 63)).

The Court concludes that the Menter Defendants are absolutely immune from monetary liability under § 1983 for their role in prosecuting the civil and criminal proceeding against Weinberg and TI Inn Holdings. Furthermore, although the Complaint seeks injunctive relief "to void or vacate the declaration of the Inn as unsafe and the order that it be vacated and not used" and "to permanently enjoin and restrain and/or reverse these violations, and [direct] Defendants to take corrective measure in avoidance of future occurrences," (*id.* ¶ 214), Plaintiffs have not

provided any legal basis for obtaining this equitable relief against the Menter Defendants. Given that Plaintiffs' claims against the Menter Defendants for violations of procedural due process (Count 1), substantive due process (Count 2), and double jeopardy (Count 6) rest only on the Menter Defendants' prosecutorial conduct, those claims must be dismissed.[18]

### 2.    First Amendment Claims

In addition to the allegations concerning the Menter Defendants' prosecutorial role, the Complaint contains allegations that Menter attorneys "harass[ed]" Plaintiffs.[19] (Dkt. No. 33, ¶ 124). On September 24, 2015, a Menter attorney sent a letter "threatening to condemn the Inn, should Plaintiffs hold a planned second annual 'Jazz Fest' event inside the building." (*Id.* ¶ 125). On February 27, 2016, the same attorney accused Plaintiffs of running a "vituperative social media campaign" and "strongly implied and/or threatened that Plaintiffs continuing to do so would be detrimental to Plaintiffs in the underlying litigation and in any settlement discussions." (*Id.* ¶ 168). Neither allegation plausibly supports a First Amendment retaliation claim, which requires that: (1) the plaintiff's speech or conduct at issue was protected; (2) the defendant took adverse action against the plaintiff; and (3) there was a causal connection between the protected speech and the adverse action. *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009). With regard to the condemnation threat, Plaintiffs do not assert that holding the event *inside the Inn* was protected speech in which they engaged or planned to engage; indeed, according to the Complaint, Plaintiffs did not intend to hold the event inside the Inn and were in the process of erecting a tent outside. (*Id.* ¶ 125). As for the allegation of "detrimental" consequences for the

---

[18] With respect to the unreasonable search and seizure claim (Count 7), the Complaint does not plausibly allege that the Menter Defendants had any involvement in the photographic surveillance and, in any event, as set forth below, the Complaint fails to state a plausible cause of action for unlawful search and seizure.

[19] The Menter Defendants do not contend that prosecutorial immunity bars the First Amendment claims. Indeed, the allegations in support of those claims do not appear to relate to the Menter Defendants' role in prosecuting the civil and criminal proceedings against Weinberg and TI Inn Holdings.

social media campaign, Plaintiffs do not specify what adverse action was threatened, thus failing to plead the adverse action element. *See Bumpus v. Canfield*, 495 F. Supp. 2d 316, 326 (W.D.N.Y. 2007) ("[V]ague intimations of some unspecified harm generally will not rise to the level of adverse action for the purpose of a First Amendment retaliation claim.").

Lastly, the Court notes that Plaintiffs allege on information and belief—but without indicating the basis for their belief—that Russell helped Zimmer and the Village Board change the public comment rules to prevent discussion of ongoing litigations. (*Id.* ¶¶ 128, 169). Such conclusory allegations do not satisfy the pleading standard under *Twombly*. *See Harrison v. City of New York*, No. 15-cv-4141, 2017 WL 4162340, at *3 (S.D.N.Y. Sept. 19, 2017) ("While a plaintiff may plead facts alleged upon information and belief where the belief is based on factual information that makes the inference of culpability plausible, such allegations must be accompanied by a statement of the facts upon which the belief is founded." (internal quotation marks omitted)). Further, even if true, these allegations would not satisfy the personal involvement requirement. *Cf. Zdziebloski v. Town of E. Greenbush*, 336 F. Supp. 2d 194, 202 (N.D.N.Y. 2004) (concluding that, since a nonsupervisor "must have directly participated in the alleged constitutional deprivation to be liable under § 1983," the defendant town attorney who advised the town board but did not vote lacked sufficient personal involvement). Accordingly, the First Amendment claims against the Menter Defendants must be dismissed.

## B.     Federal Claims Against the Clayton Defendants

### 1.     Preliminary Issues

#### a.     "Under Color of State Law" Requirement as Applied to Beattie and Beattie Enterprises

The Complaint asserts federal claims under § 1983 against Beattie and Beattie Enterprises for (1) violation of procedural due process under the Fourteenth Amendment,

(2) violation of substantive due process under the Fourteenth Amendment, and (3) unreasonable search and seizure under the Fourth Amendment (as incorporated by the Fourteenth Amendment). "Under 42 U.S.C. § 1983, constitutional torts are only actionable against state actors or private parties acting 'under the color of' state law." *Betts v. Shearman*, 751 F.3d 78, 84 (2d Cir. 2014) (quoting *Ciambriello v. County of Nassau*, 292 F.3d 307, 323 (2d Cir. 2002)). The Clayton Defendants argue that Plaintiffs fail to state a claim under § 1983 against Beattie and Beattie Enterprises because they "are not state actors" and because there are no allegations of wrongdoing by Beattie Enterprises (Dkt. No. 50-5, at 6). Plaintiffs respond that the Complaint's allegations "raise the inference that there is an identity between Beattie and his LLC," that "Beattie used his influence as a [Village Board] Trustee in furtherance of his own interests, including those of Beattie LLC," that he "abused his official position as a Trustee on the Village Board to harass them and violate their rights, as a perceived competitor of Beattie LLC," that he acted "with the authority as a Trustee to put the weight of the government behind his private decisions," and that, to the extent he "took pictures at Ingerson's request," his actions are attributable to the local government. (Dkt. No. 54, at 5–6).

As an initial matter, the Court agrees with the Clayton Defendants that Plaintiffs have not set forth any factual allegations plausibly alleging that Beattie Enterprises was a state actor. A "private entity does not become a state actor for purposes of § 1983" unless there is "'such a close nexus between the [s]tate and the challenged action' that the state is '*responsible* for the specific conduct of which the plaintiff complains.'" *Fabrikant v. French*, 691 F.3d 193, 207 (2d Cir. 2012) (alteration in original) (quoting *Cranley v. Nat'l Life Ins. Co. of Vt.*, 318 F.3d 105, 111 (2d Cir.2003)). Plaintiffs assert that Beattie Enterprises and Beattie are alter egos but provide no factual allegations in support of this assertion. In the absence of any plausible allegation that

Beattie Enterprises was a state actor, the § 1983 claims against it must be dismissed. *Twombly*, 550 U.S. at 555, 570 (holding that "factual allegations" must "raise a right to relief above the speculative level"). Nevertheless, because the Complaint alleges that Beattie acted in a dual role as a Village Board member and as Plaintiffs' business competitor, the Court must parse through the allegations specific to Beattie's conduct and determine for each action if it was taken "under color of state law."

First, with regard to the procedural due violation claim, the only allegation against Beattie is that he ratified, as a member of the Village Board, the three Unsafe Declarations issued by Ingerson. (*See* Dkt. No. 33, ¶ 148). This allegation appears to be a reference to Beattie's seconding a motion to adopt, voting for, and not recusing himself from considering a Village Board resolution "authorizing the civil and criminal prosecution of Plaintiffs for purported violation of certificate of occupancy requirements." (*Id.* ¶ 63). The Clayton Defendants do not dispute that Beattie took this action as a Village Board member and was therefore acting "under color of state law."[20] (*See* Dkt. No. 50-5, at 6 n.1).

Second, with regard to the substantive due process claim, the Complaint does not clearly specify which of Beattie's actions violate Plaintiffs' rights, but it alleges conduct by Beattie that arguably go to the claim's shock-the-conscience element. *See O'Connor v. Pierson*, 426 F.3d 187, 203 (2d Cir. 2005) (explaining that "'only the most egregious official conduct,' conduct that 'shocks the conscience,' will subject the government to liability for a substantive due process violation based on executive action" (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998))). Plaintiffs allege that Beattie (the owner of Beattie Enterprises) perceived Plaintiffs as

---

[20] As discussed below, however, Beattie is absolutely immune from liability for taking these actions. (*See infra* IV.B.1.d). The procedural due process claim against Beattie must therefore be dismissed.

competitors of his restaurant businesses, harassed them through citizen complaints leveraging

Beattie's official position in the year leading up to the July 2015 events, reported to Ingerson that

someone was living at the Inn in July 2015, took pictures of the Inn, and then ratified, as a

Village Board member, the civil and criminal prosecutions against Weinberg and TI Inn

Holdings in August 2015. (Dkt. No. 33, ¶¶ 17–18, 43, 63, 86–89, 148, 181). Except for the

ratification conduct, Plaintiffs do not claim that Beattie took these actions as a Village Board

member.[21] The analysis does not end there, however, as private conduct "fairly attributable to the

State" may be considered "state action" under substantive constitutional law and, by the same

token, actions "under color of state law" for purposes of § 1983. *Lugar v. Edmonson Oil Co.*, 457

U.S. 922, 929, 937 (1982). As the Second Circuit explained:

> For the purposes of section 1983, the actions of a nominally private
> entity are attributable to the state when: (1) the entity acts pursuant
> to the "coercive power" of the state or is "controlled" by the state
> ("the compulsion test"); (2) when the state provides "significant
> encouragement" to the entity, the entity is a "willful participant in
> joint activity with the [s]tate," or the entity's functions are
> "entwined" with state policies ("the joint action test" or "close nexus
> test"); or (3) when the entity "has been delegated a public function
> by the [s]tate," ("the public function test").

*Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008) (quoting

*Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n,* 531 U.S. 288, 296 (2001)). The only

private conduct that plausibly falls within these categories is Beattie's reporting that someone

was living at the Inn and his taking pictures of the Inn. Though the "mere reporting of

information to law enforcement is insufficient to support a claim of state action by a private

party," *De Ratafia v. County of Columbia*, No. 13-cv-174, 2013 WL 5423871, at *14 (N.D.N.Y.

---

[21] The allegation that Beattie "leveraged" his official position to harass Plaintiffs through citizen complaints is vague and conclusory. (Dkt. No. 33, ¶ 87). Accordingly, it cannot sustain Plaintiffs' substantive due process claim.

Sept. 26, 2013), the conduct alleged here strays beyond mere reporting to law enforcement and plausibly suggests that Beattie was "a willful participant in joint activity with the State or its agents." *Bishop v. Toys "R" Us-NY LLC*, 414 F. Supp. 2d 385, 396 (S.D.N.Y. 2006), *aff'd*, 385 F. App'x 38 (2d Cir. 2010). Indeed, Beattie allegedly confessed to Weinberg that Ingerson "asked him to take and email pictures." (Dkt. No. 33, ¶ 94). For purposes of the substantive due process claim, therefore, the Court concludes that the Complaint adequately alleges that Beattie "acted under color of state law" when he photographed the Inn, reported his findings to Ingerson, and voted to ratify the proceedings against Plaintiffs.[22]

Third, with regard to the unreasonable search and seizure claim, the only allegation is that Beattie, "then a public officer," photographed the Inn, with "no warrant to perform this surveillance." (Dkt. No. 33, ¶ 181). As just discussed, this alleged action plausibly qualifies as conduct "under color of state law."[23]

### b.    Official Capacity

The Clayton Defendants argue that the "official capacity claims" against Zimmer, Beattie, and Ingerson are "duplicative and nothing more than claims against the Village." (Dkt. No. 50-5, at 7). Indeed, "official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent—at least where Eleventh Amendment considerations do not control analysis." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 n.55 (1978); *accord Lore v. City of Syracuse*, 670 F.3d 127, 168 (2d Cir. 2012). Plaintiffs counter that it is "confusing" whether these individuals hold "office[s]" that are "cognizable legal entit[ies] separate from" the Village as a municipal corporation. (Dkt. No. 54, at 6–7).

---

[22] In Part IV.B.3 *infra*, the Court discusses whether these actions are sufficient to state a substantive due process claim.

[23] The merits of the unreasonable search and seizure claim are discussed in Part IV.B.8 *infra*.

Plaintiffs' argument is meritless. Under New York law, a mayor and a village board trustee are "officers" of the village that employs them. *See* N.Y. Village Law § 3-301(1) (listing officers of a village, including the position of mayor and board trustee). Additionally, New York law authorizes villages to have "such other officers, including deputies, as the board of trustees shall determine." *Id.* § 3-301(3). Under this authority, the Village Board created the "office of Code Enforcement Officer." Village of Clayton Code § 70-3(A). It follows that the claims against Zimmer as mayor, Beattie as Village Board trustee, and Ingerson as code enforcement officer are claims against the Village to the extent they are sued for damages in their official capacity, and accordingly must be dismissed.[24] *See, e.g.*, *Escobar v. City of New York*, 05-cv-3030, 2007 WL 1827414, at *3 (E.D.N.Y. June 25, 2007) ("A suit for damages against a municipal officer *in their official capacity* is the equivalent of a damage suit against the municipality itself."); *Hulett v. City of Syracuse*, 253 F. Supp. 3d 462, 498 (N.D.N.Y. 2017) ("[A]bsent a claim seeking injunctive relief to remedy an *ongoing* violation of federal law, 'a § 1983 suit against a municipal officer in his official capacity is treated as an action against the municipality itself.'" (quoting *Lin v. County of Monroe*, 66 F. Supp. 3d 341, 353 (W.D.N.Y. 2014))).

### c.    Personal Involvement

The Clayton Defendants seek dismissal of the claims against Zimmer and Beattie sued in their individual capacities on the ground that they lacked personal involvement, a prerequisite for § 1983 suits. (Dkt. No. 50-5, at 8 (citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995))). Supervisory personnel may be considered "personally involved" only if they: (1) directly

---

[24] Although the Complaint includes requests for injunctive relief, it does not specify which particular actions Zimmer, Beattie, and Ingerson should be directed to do or prohibited from doing.

participated in the violation; (2) failed to remedy that violation after learning of it through a

report or appeal; (3) created, or allowed to continue, a policy or custom under which the

violation occurred; (4) had been grossly negligent in managing subordinates who caused the

violation; or (5) exhibited deliberate indifference to the rights of others by failing to act on

information indicating that the violation was occurring. *Colon*, 58 F.3d at 873.[25]

The factual allegations on which the Court relied in concluding that the Complaint

sufficiently alleges Beattie was a state actor also support the conclusion that the Complaint

sufficiently alleges Beattie's personal involvement in the alleged constitutional deprivations.

Thus, the Court turns its attention to the § 1983 claims against Zimmer. The Complaint states

that Zimmer ratified the three Unsafe Declarations, (Dkt. No. 33, ¶ 148), agreed, as of July 29,

2015, to continue the prosecution of Weinberg, (*id.* ¶ 113), "failed to intercede" when Plaintiffs

sent her an eight-page letter on September 1, 2015 "begging" her to deescalate the conflict, (*id.*

¶¶ 67, 121), and created and applied new rules for public comment at Village Board meetings in

an effort to muzzle Plaintiffs' speech, (*id.* ¶¶ 128, 129, 169).[26]

Zimmer's ratification of the three Unsafe Declarations and Weinberg's prosecution, as

well as her modification and application of rules for public comment, indicate "actual direct

---

[25] In *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009), the Supreme Court explained that "a plaintiff must plead that each Government-official defendant, through the official's individual actions, has violated the Constitution." The Second Circuit has not yet addressed how *Iqbal* affects *Colon*'s standard for establishing supervisory liability. *See Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013) (noting that *Iqbal* may have "heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations" but not reaching the impact of *Iqbal* on *Colon* because the complaint "did not adequately plead the Warden's personal involvement even under *Colon*"); *see also Jamison v. Fischer*, 617 Fed. App'x 25, 28 n.1 (2d Cir. 2015) (affirming the district court's qualified immunity ruling without addressing "whether the district court correctly dismissed the complaint against [the defendant supervisor] for lack of personal involvement"). Because it is unclear whether, or to what extent, *Iqbal* overrules or limits *Colon*, the Court will apply the *Colon* factors, as have other courts in this district. *See Braham v. Perelmuter*, No. 15-cv-1094, 2017 WL 3222532, at *12, 2017 U.S. Dist. LEXIS 118356, at *35 (D. Conn. July 28, 2017).

[26] Additionally, the Complaint alleges conduct by Zimmer that relates to Plaintiffs' state law claims—notably, that she made public statements blaming Plaintiffs for the failure of settlement discussion, (*id.* ¶¶ 131, 201, 202), and falsely accused Minnick of physically abusing Weinberg, (*id.* ¶¶ 133, 204).

participation in the constitutional violation[s]" of Plaintiff's due process and First Amendment rights, respectively, and therefore satisfy § 1983's personal involvement requirement.[27] *Hernandez v. Keane*, 341 F.3d 137, 145 (2d Cir. 2003); *see also Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001) ("[A]s we understand it, 'direct participation' as a basis of liability in this context requires intentional participation in the conduct constituting a violation of the victim's rights by one who knew of the facts rendering it illegal." (footnote omitted)).

### d.    Absolute Immunity

The Clayton Defendants contend that Zimmer, Beattie, and the Board are absolutely immune for their approval of a resolution to prosecute Plaintiffs criminally and civilly, their ratification of the three Unsafe Declarations, and their response to Weinberg's hearing requests. (Dkt. No. 50-5, at 10). Further, they argue that Zimmer is absolutely immune for her creation and application of new public comment rules and for her ratification, "if any," of Ingerson's surveillance. (*Id.* at 10–11). Plaintiffs respond that these actions were not "legislative activities." (Dkt. No. 54, at 8–9).

"Although the Second Circuit has recognized that members of a town board may be entitled to legislative immunity, such immunity extends only to legislative activity . . . ." 33 *Seminary LLC v. City of Binghamton*, 120 F. Supp. 3d 223, 256 (N.D.N.Y. 2015), *aff'd*, 670 F. App'x 727 (2d Cir. 2016). "Whether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it." *Bogan v. Scott-Harris*, 523 U.S. 44, 55 (1998). Thus, "legislative officials may therefore be liable for their enforcement and

---

[27] As discussed below, however, Zimmer is absolutely immune from liability for ratifying the prosecution of Weinberg. (*See infra* IV.B.1.d). In this regard, Zimmer's alleged acquiescence with the continued prosecution of Weinberg and her "failure to intercede" upon receiving Plaintiffs' letter are bound up in her decision to ratify the prosecution; accordingly, even assuming these actions are sufficient for personal involvement purposes, Zimmer is likewise immune from liability for these actions.

administrative actions." *S. Lyme Prop. Owners Ass'n, Inc. v. Town of Old Lyme*, 539 F. Supp. 2d 547, 558 (D. Conn. 2008). Distinguishing administrative action regarding "a single individual" from "the kind of broad, prospective policymaking that is characteristic of legislative action," the Second Circuit has noted that the fact that actions were taken by a board vote would not "alter[] the otherwise administrative nature of the[] actions." *Harhay v. Town of Ellington Bd. of Educ.*, 323 F.3d 206, 211 (2d Cir. 2003).

Applying these principles to the alleged actions at issue here, it is clear that all of them, save the change to public comment rules, involve administrative or enforcement decisions applicable to Plaintiffs only, and do not exhibit the generality or prospectiveness that is characteristic of legislative action. Legislative immunity, therefore, only attaches to the modification of the public comment rules (but not to their enforcement). With regard to the ratification of Plaintiffs' criminal and civil prosecution, a different sort of absolute immunity attaches. As mentioned above, (*see supra* Part IV.A.1), "absolute immunity applies not only to the prosecutor himself, but extends to 'officials performing certain functions analogous to those of a prosecutor,'" *Verbeek*, 158 F. Supp. 2d at 280 (quoting *Butz*, 438 U.S. at 515), including municipal officers who authorize legal proceedings in pursuit of governmental interests, *see Spear*, 954 F.2d at 66. Consequently, Zimmer, Beattie, and the Village Board are entitled to prosecutorial immunity for their ratification of the legal proceedings against Plaintiffs.

### 2.    Procedural Due Process Claim

Plaintiffs claim that Defendants deprived them of property without due process when Ingerson, acting on three occasions in concert with the other Defendants, "declared the Inn unsafe and unfit for human habitation and required it to be vacated and not used . . . without even the most basic incidents of due process such as a bona-fide investigation with written findings specifying code violations, adequate notice to Plaintiffs, and adequate opportunity to cure." (Dkt.

No. 33, ¶¶ 143–144). Further, Plaintiffs assert that the Village violated their due process rights when it denied Plaintiff's request for a hearing regarding those declarations. (*Id.* ¶ 147).

The Due Process Clause of the Fourteenth Amendment contains both a procedural component and a substantive component. *Zinermon v. Burch,* 494 U.S. 113, 125 (1990). The substantive component "bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them." *Id.* (internal quotation marks omitted). The procedural component, on the other hand, applies where there is an alleged deprivation by government action of a constitutionally protected interest without sufficient procedural safeguards, such as notice and a hearing. *Id.*

"The first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty.'" *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999) (quoting U.S. Const. amend. XIV); *see also Spinelli v. City of New York*, 579 F.3d 160, 168 (2d Cir. 2009) ("To succeed on a claim of procedural due process deprivation under the Fourteenth Amendment—that is, a lack of adequate notice and a meaningful opportunity to be heard—a plaintiff must first establish that state action deprived him of a protected property interest."). "Property interests that are protected by the Due Process Clause of the Fourteenth Amendment are not created by that amendment; they are defined by 'existing rules or understandings that stem from an independent source such as state law.'" *Spinelli*, 579 F.3d at 168–69 (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)). "Only after finding the deprivation of a protected interest do we look to see if the State's procedures comport with due process." *American Manufacturers*, 526 U.S. at 59. To determine what process is due, courts must balance the three factors set forth in *Mathews v. Eldridge*: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such

interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." 424 U.S. 319, 335 (1976).

### a.    Deprivation of Property Interest

The Clayton Defendants argue that the procedural due process claim should be dismissed to the extent it is brought by Weinberg, Minnick, and TI Enterprises because they "do not own the subject property." (Dkt. No. 50-5, at 11). The Menter Defendants make a similar point concerning Weinberg's and Minnick's claims, although their argument is cast in jurisdictional terms; in their view, Weinberg and Minnick do not have property interests in the Inn and merely seek to assert the rights of third-party TI Inn Holdings.[28] (Dkt. No. 52-1, 12–13). Neither group of Defendants, however, contends that TI Inn Holdings does not have a property interest. In their opposition, Plaintiffs respond that each Plaintiff has "been deprived of one or more property rights that are personal to" each of them: TI Enterprises of its "rights to possess and use the Inn, the right to exclude others, and the right to obtain a profit from the Inn," and Weinberg and Minnick of the property rights (e.g., the rights of possession, exclusion, disposition, use, and

---

[28] Even though the Court is dismissing the Menter Defendants on the basis of prosecutorial immunity—and consequently need not consider other issues raised by the Menter Defendants—the Court must nevertheless address the Menter Defendants' "jurisdictional" arguments, as these arguments challenge the Court's power to decide the merits of the claims. The Menter Defendants contend that, for some of the claims—due process, First Amendment, and Fourth Amendment—certain Plaintiffs attempt to assert the personal rights of other Plaintiffs. (*See* Dkt. No. 52-1, at 12–18). They frame that problem as one going to "standing," which leads them to cast the issue as a jurisdictional one (*Id.*). "The Supreme Court recently noted that '[t]he limitations on third-party standing' could be considerations that go to the merits of an issue, rather than the court's jurisdiction." *Wash. Tennis & Educ. Found., Inc. v. Clark Nexsen, Inc.*, 270 F. Supp. 3d 158, 163 n.3 (D.D.C. 2017) (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1387 n.3 (2014)). The Supreme Court, however, did not resolve that issue in *Lexmark* and, in this circuit, third-party standing is treated as jurisdictional. *See Keepers, Inc. v. City of Milford*, 807 F.3d 24, 39 (2d Cir. 2015). In any event, whether third-party claims raise jurisdictional or merits issues, none are presented here: each Plaintiff alleges violations of his or its own property rights.

enjoyment of fruits and profits) flowing from their indirect ownership of the Inn. (Dkt. No. 54, at 10).

    None of the Defendants cite any New York authority for the proposition that indirect owners of real estate lack property interests of their own with respect to the underlying real estate.[29] Therefore, at this stage, the Court is unable to determine whether Weinberg and Minnick lack personal property interests under New York law for purposes of the procedural due process analysis. With regard to TI Enterprises, Defendants' arguments are similarly misplaced. While mere "harm to business operations" may not constitute a deprivation of a property interest, (Dkt. No. 50-5, at 11; Dkt. No. 52-1, at 15), TI Enterprises alleges more than just harm to business operations. The Complaint asserts a deprivation of possessory, use, and enjoyment interests by alleging that the "declaration of the building as unsafe and ordering and posting that all persons vacate, cease and desist from occupancy and use of these premises . . . deprived Plaintiff TI Holdings of its property rights, as a tenant, to *inter alia*, peaceably and quietly have, hold, use, and enjoy the premises." (Dkt. No. 33, ¶ 14 (internal quotation marks omitted)). Defendants have not cited any New York authority for the proposition that a lessee does not enjoy the aforementioned property interests. Therefore, the Court cannot conclude at this stage that TI Enterprises lacks a property interest.

---

[29] The Menter Defendants rely on cases concerning corporate stockholders' lack of a derivate right of action to bring claims *on a corporation's behalf* when the corporation has no impediment to bringing the claims on its own. (*See* Dkt. No. 52-1, at 13). But that line of precedent is completely silent on indirect owners' right to bring suit *on their own behalf* to vindicate their own, personal property rights.

### b.    Sufficiency of Process

The Court notes that the Clayton Defendants[30] have confined their arguments to whether Weinberg, Minnick, and TI Enterprises lack property interests of their own, and have not addressed the second prong of the analysis—whether the "process" afforded under New York law (by way of the Village Code and judicial review under Article 78 of the CPLR) satisfies the requirements of the Fourteenth Amendment. Accordingly, the Court does not consider this question at this time. *See Jones v. Albany Cty. Civil Serv. Comm'n*, 985 F. Supp. 280, 282 (N.D.N.Y. 1997) ("[T]hough the Court suspects that this claim itself is vulnerable to dismissal for a host of reasons, defendants have failed to raise any such arguments. A district court may not dismiss an action for failure to state a claim based upon grounds not raised by the parties.").

### 3.    Substantive Due Process Claim

Plaintiffs allege that Defendants not only violated their procedural but also their substantive due process rights. (Dkt. No. 33, ¶¶ 150–152). Courts recognize a claim for violation of substantive due process rights where a government act is "arbitrary or capricious." *See Southview Assocs., Ltd. v. Bongartz*, 980 F.2d 84, 96–97 (2d Cir. 1992). A plaintiff can succeed on a substantive due process claim by showing that he "had a valid property interest, and defendants infringed on that interest in a constitutionally arbitrary manner," i.e., by taking an action "that shocks the conscience." *Rosato v. Town of Yorktown*, No. 13-cv-4069, 2014 WL 521577, at *5, 2014 U.S. Dist. LEXIS 19043, at *14 (S.D.N.Y. Jan. 27, 2014); *see also O'Mara v. Town of Wappinger*, 485 F.3d 693, 700 (2d Cir.). Substantive due process does not protect against "government action that is incorrect or ill-advised"; rather, the conduct in question "must

---

[30] The Menter Defendants do address that issue, (Dkt. No. 52-1, at 18–19), but given that the procedural due process claim is dismissed against them on the basis of prosecutorial immunity, the Court has not considered their arguments on sufficiency of the process. (*See supra* Part IV.A.1).

be outrageous and egregious under the circumstances; it must be truly brutal and offensive to human dignity." *Id.* (first quoting *Kaluczky v. City of White Plains*, 57 F.3d 202, 211 (2d Cir. 1995); then quoting *Lombardi v. Whitman*, 485 F.3d 73, 81 (2d Cir. 2007)). "Government regulation of a landowner's use of his property is deemed arbitrary or irrational, and thus violates his right to substantive due process, only when government acts with no legitimate reason for its decision." *Southview*, 980 F.2d at 104 (internal quotation marks omitted). As the Second Circuit has explained, substantive due process "does not forbid government actions that might fairly be deemed arbitrary or capricious and for that reason correctable in a state court lawsuit seeking review of administrative action. Substantive due process standards are violated only by conduct that is so outrageously arbitrary as to constitute a gross abuse of governmental authority." *Natale v. Town of Ridgefield*, 170 F.3d 258, 263 (2d Cir. 1999).

Explicit constitutional provisions, however, displace substantive due process protections under the Fourteenth Amendment. *See Velez v. Levy*, 401 F.3d 75, 94 (2d Cir. 2005) ("[W]here a specific constitutional provision prohibits government action, plaintiffs seeking redress for that prohibited conduct in a § 1983 suit cannot make reference to the broad notion of substantive due process."). This dooms Plaintiffs' substantive due process claim against Ingerson, which is subsumed in the more particularized allegations in support of Plaintiffs' First Amendment retaliation and equal protection claims, and which must therefore be dismissed. *See Velez*, 401 F.3d at 94 ("[As] defendants' purported actions would not—but for the allegations of First Amendment violations, or (now abandoned) Equal Protection Clause violations—be sufficiently shocking to state substantive due process claims, . . . plaintiff's substantive due process claim is either subsumed in her more particularized allegations, or must fail." (footnote omitted)). On the

other hand, the Clayton Defendants do not point to specific constitutional provisions that would cover Beattie's alleged self-dealing.

The Clayton Defendants contend that the Complaint's allegations against Beattie do not satisfy the shock-the-conscience test. They characterize Beattie's alleged conduct—his harassment of Plaintiffs through citizen complaints, his report that someone was living at the Inn, his taking photographs at Ingerson's request, and the allegation that Beattie or one of his associates revealed the cook as a sex offender—as "amount[ing] to, at worst, unfriendly or impolite behavior or indiscretions." (Dkt. No. 50-5, at 12–13). In their view, Zimmer's conduct similarly fails to shock the conscience, as Zimmer only ratified Ingerson's declarations that the Inn was unsafe and declined to intercede on Plaintiffs' behalf. (*Id.* at 13). Plaintiffs reject the Clayton Defendants' "parsing" of the Complaint's allegations into "individual events," and argue that Defendants' conduct, in the aggregate, "actually shocked . . . the conscience of the community in Clayton." (Dkt. No. 54, at 11). The Court agrees with the Clayton Defendants that Beattie's nonprosecutorial conduct[31] does not rise to the requisite conscience-shocking level. *See Rankel v. Town of Somers*, 999 F. Supp. 2d 527, 532–35, 547 (S.D.N.Y. 2014) (concluding that allegations that neighbors conspired with their friends in the town government to have the town engineer file baseless wetland code violations and misdemeanor charges against the plaintiff to benefit their own interests were the "types of allegations of 'improper motives' and 'selective enforcement' on the part of municipal officials" that "fall into the 'non-conscience-shocking category'"). *Id.*

---

[31] As discussed above, Beattie is absolutely immune from liability for ratifying Weinberg's prosecution. (*See supra* Part IV.B.1.d).

Finally, as to the substantive due process claim against Zimmer and the Village Board, the only conduct alleged is their ratification of Weinberg's prosecution. Liability cannot attach to that conduct. (*See supra* Part IV.B.1.d). Thus, the substantive due process claim is dismissed.

### 4.    Equal Protection Claim

Plaintiffs Weinberg and TI Inn Holdings claim that the Village, the Village Board, Zimmer, and Ingerson violated their equal protection rights through their "exceedingly aggressive code enforcement efforts," which Plaintiffs claim on information and belief are "previously unknown in Clayton and are unprecedented in Jefferson County." (Dkt. No. 33, ¶ 154). The Complaint references five other instances of "similarly situate[ed] persons who are, on information and belief, more-favored than Plaintiffs," (*id.* ¶ 155), and whose "markedly different" treatment "has no rational basis," (*id.* ¶ 161). These include: (1) "the new residential owners of the Baptist Church in Clayton," whom the Village and Ingerson did not require to "pull" the necessary building permit to remove load bearing structures, whereas Ingerson required Plaintiff to "pull" a building permit "unnecessarily for work that did not require the removal of load-bearing structures," (*id.* ¶ 156); (2) "the owner of a waterfront property who built residential and commercial buildings thereupon unlawfully," but against whom Defendants have not taken any enforcement action, in contrast to their actions against Plaintiffs, (*id.* ¶ 157); (3) "a local citizen[]," for whom Defendants arranged "to reside in a previously commercial property, rather than take enforcement action," (*id.* ¶ 158); (4) Ingerson's "drifter brother," against whom Defendants "failed to enforce certificate of occupancy requirements related to [his] residence," (*id.* ¶ 159); and (5) Beattie himself, against whom Defendants "failed to enforce code violations related to the location of a wall on [his] residence," (*id.* ¶ 160). Additionally, Plaintiffs note that "the underlying actions may have been motivated, at least in part, by

discriminatory animus" because Weinberg and Minnick "are openly gay" and Weinberg "is openly Jewish." (*Id.* ¶ 162).

The Clayton Defendants move to dismiss the equal protection claim on the ground that Plaintiffs have failed to allege differential treatment on a "class of one" theory. (*See* Dkt. No. 50-5, at 14–15). Under that theory, a plaintiff must allege that "she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985). "[C]lass-of-one plaintiffs must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves." *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006). According to the Clayton Defendants, some of Plaintiffs' comparators are not sufficiently similar: the Baptist Church, Beattie's property, and Ingerson's property are residential, not commercial like the Inn. (Dkt. No. 50-5, at 15). With regard to the other two comparators—the local citizen allowed to reside in a previously commercial property and the waterfront property owner who build without a permit—the Clayton Defendants contend that the allegations as to them "are so completely vague and factually devoid that they are meaningless allegations." (*Id.*).

In their opposition, Plaintiffs respond that their equal protection claim is based on a "selective enforcement" theory. (Dkt. No. 54, at 12–13). That theory requires a showing that: "(1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *LeClair v. Saunders*, 627 F.2d 606, 609–10 (2d Cir. 1980). The discrimination must be intentional or purposeful. *Id.* at 609. As Plaintiffs note, (Dkt. No. 54, at 12–13)), some district

courts in this circuit have held that the "extremely high degree of similarity" standard applies in both selective enforcement and class-of-one cases, whereas other courts have used a more relaxed standard, requiring that comparators be similarly situated "in all material respects," *Joglo Realties, Inc. v. Seggos*, 229 F. Supp. 3d 146, 153 (E.D.N.Y. 2017)—i.e., a plaintiff must identify comparators whom a "prudent person" would deem to be "roughly equivalent," but there need not be "an exact correlation" between the plaintiff and the comparators, *Mosdos Chofetz Chaim, Inc. v. Village of Wesley Hills*, 815 F. Supp. 2d 679, 696 (S.D.N.Y. 2011) (quoting *Abel v. Morabito*, No. 04-cv-07284, 2009 WL 321007, at *5 (S.D.N.Y. Feb. 10, 2009)). Plaintiffs argue that they are in a "roughly equivalent" position to their comparators because Defendants: (1) "allowed those individuals to live in various properties illegally without criminally and civilly prosecuting the owners of those properties and declaring their properties unsafe"; (2) "turned a blind eye to actual code violations for some property owners for years on end" while Plaintiffs were "immediately charged"; and (3) "cooperated with comparators in resolving any code compliance issues instead of prosecuting them." (Dkt. No. 54, at 14).

Given the allegations of discriminatory animus, (*see, e.g.*, Dkt. No. 33, ¶ 41), the Court construes Plaintiffs' allegations as resting on a selective enforcement theory. However, the Court need not decide whether the more relaxed standard should apply; indeed, Plaintiffs have not pled sufficient facts for the Court to determine that "it is plausible that a jury could ultimately determine that the comparators are similarly situated." *Mosdos*, 815 F. Supp. 2d at 698. None of Plaintiffs' comparators involve the enforcement or nonenforcement of building permit or certificate of occupancy rules against commercial property owners with regard to commercial property. Accordingly, Weinberg's and TI Inn Holdings' equal protection claim must be dismissed.

### 5.    First Amendment Claims

The Complaint alleges that Ingerson and Zimmer retaliated against Plaintiffs for exercising their free speech rights, (Dkt. No. 33, ¶¶ 165, 167, 171), and Zimmer suppressed their free speech at Village Board meetings, (Dkt. No. 33, ¶¶ 169).[32]

#### a.    Retaliation for Speech

To state a First Amendment retaliation claim, a plaintiff must allege that: (1) the speech or conduct at issue was protected; (2) the defendant took adverse action against the plaintiff; and (3) there was a causal connection between the protected speech and the adverse action. *Espinal*, 558 F.3d at 128. To establish an adverse action, the plaintiff must show conduct "that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights." *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003).

Plaintiffs allege that they engaged in protected speech in October 2014 by posting the "Haunted Hotel Cancelled Due to Nanny State" message on their marquee sign and Facebook accounts and by Weinberg's "vocal . . . challenges to [Ingerson's] authority," after Ingerson told Plaintiffs they could not have people at the Inn for the event. (Dkt. No. 33, ¶¶ 97, 165). Further, Plaintiffs allege that they engaged in protected speech when Weinberg told Zimmer that he would take legal action against the Village if Ingerson did not leave Weinberg and the Inn alone—a conversation prompted by Ingerson's demand on June 22, 2015 (to which Weinberg objected) that a banner on the front porch of the Inn that congratulated Weinberg on his admission to the New York Bar be removed. (*Id.* ¶ 171). Plaintiffs claim that, as a result of these

---

[32] The First Amendment claims against the Menter Defendants are addressed above. (See *supra* Part IV.A.2). It should be noted that the Menter Defendants made a purportedly jurisdictional challenge to Plaintiffs' First Amendment claims similar to their challenge to the due process claims, (Dkt. No. 52-1, at 16–17); the former fails for the same reasons that the latter did—each Plaintiff here asserts his or its own personal right to free speech.

instances of alleged protected speech, Ingerson and Zimmer retaliated by pursuing the

enforcement actions starting on July 2, 2015.[33] (Dkt. No. 33, ¶¶ 165, 171).

The Clayton Defendants move to dismiss the First Amendment retaliation claim on the

grounds that Plaintiffs have not sufficiently pled that the adverse actions were causally related to

Plaintiffs' speech, and that Plaintiffs "have not alleged that they were deterred." (Dkt. No. 50-5,

at 16–17). Plaintiffs respond that chilled speech is not a requirement for First Amendment

retaliation claims and that they "have pled facts from which it is reasonable to infer that

defendants' actions were motivated, at least in part, by Plaintiffs' exercise of their free speech

rights." (Dkt. No. 54, at 14–15).

Plaintiff is correct that "[c]hilled speech is not the *sine qua non* of a First Amendment

claim." *Dorsett v. County of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013). For purposes of a First

Amendment retaliation claim, a defendant's actions must have caused the speaker "some injury,"

*id.*, and it suffices that the defendant's conduct "would deter a similarly situated individual of

ordinary firmness from exercising . . . constitutional rights," *Davis*, 320 F.3d at 353, regardless

of whether the defendant effectively succeeded in chilling the plaintiff's speech, *see Dorsett*, 732

F.3d at 160 ("[I]t is clear that the [defendant's] alleged retaliation did not curtail the Plaintiffs'

speech. [The plaintiff] Brewington remained politically active while the settlement was pending

and [the plaintiff] Dorsett maintained her association with Brewington.").

Initiation of enforcement actions in retaliation for protected speech might very well

qualify as an adverse action, *see Wrobel v. County of Erie*, 211 F. App'x 71, 73 (2d Cir. 2007)

(noting that a "factfinder might well conclude that defendants' . . . initiation of a criminal

---

[33] Weinberg also alleges that he was "utterly silenced" because of "the prospect that anything he said might be used against him in court." (Dkt. No. 33, ¶ 170).

investigation . . . would be sufficient to dissuade a reasonable [person] from asserting his First Amendment rights"), but Plaintiffs must also sufficiently allege a causal connection between the protected speech and the adverse action. The Complaint, however, is devoid of factual allegations causally linking the October 2014 speech (arising out of the cancellation of the "Haunted Hotel" charity event) to the July 2015 enforcement actions. On the other hand, given the temporal proximity between the June 2015 speech (arising out of the removal of the congratulatory banner) and the July 2015 enforcement actions, a causal connection may be inferred. *See Espinal*, 558 F.3d at 129. Therefore, Plaintiffs' First Amendment retaliation claim survives against Ingerson and Zimmer to that extent that Plaintiffs were retaliated for engaging in protected speech in late June 2015.

### b.     Restraints on Speech

The Complaint alleges that Zimmer restrained Plaintiffs' speech by changing the rules on public comments at Village Board meetings to preclude discussion of litigation, requesting that the Chief of Police stay at a Village meeting after Weinberg and Minnick arrived, and ordering the Chief of Police to "rise to silence" Minnick at another meeting, (Dkt. No. 33, ¶ 169). The Clayton Defendants argue that the allegations against Zimmer are not sufficiently specific in that "[i]t is not at all clear whether plaintiffs are trying to make a prior restraint claim about the legality of [the public comment] rule that applies to all members of the public, or whether their claim is just about one occasion when Zimmer enforced the rule against Minnick." (*Id.* at 17). The Complaint, however, plausibly alleges that Zimmer restricted Plaintiffs' speech at Village Board meetings. (Dkt. No. 33, ¶¶ 128–129). Since the parties did not brief what kind of forum Village Board meetings are and whether restricting discussions of litigation at Village Board meetings is a permissible restriction on speech, the Court will not consider those issues at this

time. *Cf. Smith v. City of Middletown*, No. 09-cv-1431, 2011 WL 3859738, at \*5 (D. Conn. Sept. 1, 2011), *aff'd sub nom. Smith v. Santangelo*, 518 F. App'x 16 (2d Cir. 2013).

### 6.    Takings Claim

Plaintiffs claim that the "order that the Inn be vacated and not used or occup[i]ed for any purpose, in the purported interest of public safety, constitutes a regulatory taking of private property for public use." (Dkt. No. 33, ¶ 174). The Clayton Defendants move to dismiss the takings claim on ripeness grounds because Plaintiffs failed to exhaust their state remedies, as required under *Williamson County Regional Planning Commission v. Hamilton Bank*, 473 U.S. 172, 195 (1985) ("[I]f a State provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation Clause until it has used the procedure and been denied."). (Dkt. No. 50-5, at 18). Under New York law, there is a "reasonable, certain and adequate provision," *Williamson*, 473 U.S. at 194, for seeking compensation for a regulatory taking. The property owner may bring an Article 78 proceeding to compel compensation under Article I, Section 7 of the New York Constitution. *See Vandor, Inc. v. Militello*, 301 F.3d 37, 39 (2d Cir. 2002); *Livant v. Clifton*, 334 F. Supp. 2d 321, 326 (E.D.N.Y. 2004), *aff'd*, 272 F. App'x 113 (2d Cir. 2008). In their opposition, Plaintiffs concede that they did not avail themselves of an Article 78 proceeding,[34] but they contend that "an Article 78 proceeding was unavailable to Plaintiffs *as a matter of law*, because plaintiff was already before more than one court challenging the Village's actions." (Dkt. No. 54, at 16).

Article 78 provides, in part, that "a proceeding under this article shall not be used to challenge a determination" that "is not final or can be adequately reviewed *by appeal* to a court

---

[34] The Court notes that it was Plaintiffs' burden to allege that they had exhausted state remedies as required by *Williamson. See Viteritti v. Incorporated Village of Bayville*, 831 F.Supp.2d 583, 591 (E.D.N.Y. 2011) ("Courts within the Second Circuit have uniformly dismissed Fifth Amendment takings claims at the pleadings stage when plaintiffs fail to sufficiently allege that they have availed themselves of such state procedures.").

or to some other body or officer." N.Y. C.P.L.R. 7801 (emphasis added). This provision is a codification of the traditional doctrines of finality and exhaustion in administrative law. *See* Vincent C. Alexander, *Practice Commentaries*, McKinney's Cons. Laws of N.Y., Book 7B, N.Y. C.P.L.R. 7801, C7801:7 ("CPLR 7801(1) embodies the traditional doctrine of administrative law that a determination must be final and the petitioner must exhaust his or her administrative remedies before seeking judicial relief."). Although the exhaustion requirement usually necessitates the exhaustion of administrative appeals (whereby a party appeals a determination within an administrative agency), it may also call for the exhaustion of judicial appeals (whereby the party appeals the determination to a court) to the extent such appeal is available as provided by law. For example, in *Church of the Chosen v. City of Elmira*, the court held that the petitioners could not proceed by way of Article 78 to challenge the "orders of City Court which enjoined the continued occupancy of the premises at issue" because "their proper remedy was an appeal to County Court" under the applicable New York statute. 18 A.D.3d 978, 979 (3d Dep't 2005). Similarly, the court in *Young v. Erie County Office of Child Support Enforcement* rejected an Article 78 petition challenging "a determination that respondent acted unlawfully in suspending [petitioner's] driver's license for failure to pay child support arrears" because "the applicable statute provides for review of respondent's determination through objections filed with Family Court." 151 A.D.3d 1772, 1772 (4th Dep't 2017).

Plaintiffs' argument that Article 78 remedies were unavailable to them because criminal and civil proceedings were pending against them turns the exhaustion requirement on its head. As a textual matter, section 7801 of the CPLR requires exhaustion of administrative and judicial "appeal[s]" by an aggrieved party. Criminal and civil proceedings commenced by officials seeking to enforce compliance with their own determination cannot plausibly be deemed to be an

"appeal" of such determination. Moreover, Plaintiffs do not point to any New York statute or rule providing that a code enforcer's determination can be appealed directly to a court. On the contrary, they cite a provision of the Village Code providing that an aggrieved party may challenge the code enforcer's determination that a building or structure is unsafe to the Village Board. (Dkt. No. 33, ¶¶ 81, 83 (quoting Village of Clayton Code § 70-9(B)(3))). It therefore appears that there was a path to administrative review of Ingerson's determination that the Inn was unsafe: Plaintiffs had to exhaust their administrative remedies by appealing to the Village Board, and if their appeal was denied, Plaintiffs could petition for judicial review under Article 78. Since it is undisputed that Plaintiffs did not seek judicial review under Article 78 within the requisite time, their takings claim is unripe under *Williamson* and must be dismissed.

### 7.    Double Jeopardy Claim

Plaintiffs claim that Defendants violated the Double Jeopardy Clause through their "successive and parallel criminal and civil prosecutions." (Dkt. No. 33, ¶ 178). Even assuming that a private right of action exists—which the Court assumes, without deciding, only for purposes of disposing of the claim—that claim has no substance. As Defendants correctly point out, the Double Jeopardy Clause only protects against multiple criminal punishments for the same offense. (Dkt. No. 50-5, at 20); *see Hudson v. United States*, 522 U.S. 93, 99 (1997) (observing that the Double Jeopardy Clause "protects only against the imposition of multiple *criminal* punishments for the same offense"). "There are few if any rules of criminal procedure clearer than the rule that 'jeopardy attaches when the jury is empaneled and sworn.'" *Martinez v. Illinois*, 134 S. Ct. 2070, 2074 (2014) (quoting *Crist v. Bretz*, 437 U.S. 28, 35 (1978)). As is clear from the Complaint, the criminal proceeding against Weinberg and TI Inn Holdings was dismissed before trial, (*see* Dkt. No. 33, ¶¶ 78–79), so jeopardy never attached in that proceeding. Even assuming that the pending civil action against Weinberg and TI Inn Holdings

entails "criminal" punishment, Plaintiffs have not faced jeopardy in either action. Accordingly, the Court dismisses the double jeopardy claim with prejudice.

### 8.    Unreasonable Search and Seizure Claim

Plaintiffs assert that Beattie's photography of the Inn—the one picture that Ingerson "brandished" on July 2, 2015, indicating that it had been taken the night before—"constituted an unreasonable search, insofar as it both shocked the conscience of the community and violated the standards of New York State's 'peeping tom' law." (Dkt. No. 33, ¶¶ 43, 181). Similarly, Plaintiffs allege that Ingerson's 72-day "photographic surveillance" starting on July 23, 2015 was an unreasonable search. (*Id.* ¶¶ 182–183). Lastly, Plaintiffs claim that Defendants' actions, including the declarations of the Inn as unsafe, "interfered . . . with Plaintiffs' possessory interests in the property" and therefore "constitute an unreasonable seizure property." (*Id.* ¶ 184). In moving to dismiss, the Clayton Defendants argue that the photography of the Inn was not a search and that there was no seizure under the Fourth Amendment. (Dkt. No. 50-5, at 20–22).

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. In order to state a claim that a governmental act constitutes an unreasonable search in violation of the Fourth Amendment, a plaintiff must demonstrate a reasonable expectation of privacy in the location of the alleged search. *See, e.g.*, *Georgia v. Randolph*, 547 U.S. 103, 130 (2006). As the Second Circuit held in *United States v. Taborda*, "observation of objects and activities inside a person's home by unenhanced vision from a location where the observer may properly be does not impair a legitimate expectation of privacy." 635 F.2d 131, 139 (2d Cir. 1980).

There are no allegations that Beattie or Ingerson used enhanced viewing of the interior of the Inn. Further, although Plaintiffs allege that Ingerson's camera was placed "at times . . . on privately leased property without permission of the owners or a warrant," (Dkt. No. 33, ¶ 99),

they do not allege that they had a reasonable expectation of privacy from the vantage point of the

leased property. Therefore, Plaintiffs have failed to plausibly allege that the photographic

surveillance was a "search" within the meaning of the Fourth Amendment.[35] *See United States v.*

*Mazzara*, No. 16-cr-576, 2017 WL 4862793, at \*9 (S.D.N.Y. Oct. 27, 2017) (concluding that a

video camera "not installed on [the criminal defendant's] property" and "record[ing] only what a

normal passerby could have seen" did "not violate any expectation of privacy" because it did not

track "a person' public movements" but was in a "stationary" position and "record[ed] whatever

happen[ed] to cross its fixed line of sight"); *cf. United States v. Traynor*, 990 F.2d 1153, 1157

(9th Cir. 1993) (holding that observations made by officers while they are not within the

curtilage of a house do not constitute a search under the Fourth Amendment). As for Plaintiffs'

claim that a seizure occurred, Plaintiffs do not specify what property was seized; instead, they

argue that Ingerson's declarations of the Inn as unsafe "interfered" with their "property

interests," and they "contend that their property was effectively seized." (Dkt. No. 54, at 18).

Plaintiffs cite no authority in support of their argument, and the Court is aware of none.

Accordingly, the Court must dismiss the unreasonable search and seizure claim.

### 9.    *Monell* Claim

The Clayton Defendants move for dismissal of the claims against the Village on the

ground that Plaintiffs have failed to state a claim of municipal liability under *Monell v.*

*Department of Social Services*, 436 U.S. 658 (1978). (Dkt. No. 50-5, at 23). A municipality "may

not be sued under § 1983 for an injury inflicted solely by its employees or agents," and is liable

only when it actually deprives, through the execution of its policies, an individual of his

---

[35] Plaintiffs' reliance on New York's "peeping Tom" statute, N.Y. Penal Law § 250.45(3), is unavailing. That statute does not define what constitutes a search for Fourth Amendment purposes.

constitutional rights. *Monell*, 436 U.S. at 694. Official municipal policy, which "includes the decisions of a government's lawmakers, the acts of policymaking officials, and practices so persistent and widespread as to practically have the force of law," must be "the moving force" behind the violation. *Connick v. Thompson*, 563 U.S. 51, 59 n.5, 61 (2011).

Although the Complaint states that the Village "had in effect policies, practices, and customs that condoned and fostered the unconstitutional conduct of the individual Defendants," (Dkt. No. 33, ¶ 187), that conclusion is wholly conclusory. Plaintiffs allege the existence of unconstitutional policies "[o]n information and belief" only, without specifying the basis for their belief. (*Id.*). As discussed above, such allegations do not satisfy the *Twombly*/*Iqbal* pleading requirement. Accordingly, the claims against the Village are dismissed.

### C.    State Law Claims

In addition to their federal claims under § 1983, Plaintiffs assert seven New York law claims against various Defendants, including: (1) malicious prosecution; (2) intentional infliction of emotional distress ("IIED"); (3) abuse of process; (4) civil conspiracy; (5) defamation (libel); (6) defamation (slander); and (7) legal malpractice. (Dkt. No. 33, ¶¶ 191–211). Furthermore, Plaintiffs seek to hold the Village liable for the state law violations under a respondeat superior theory. (*Id.* ¶¶ 212–213). Defendants move to dismiss those claims on several grounds, including Plaintiffs' failure to comply with New York's notice-of-claim requirement.

In federal court, "state notice-of-claim statutes apply to state-law claims." *Hardy v. New York City Health & Hosp. Corp.*, 164 F.3d 789, 793 (2d Cir. 1999). Under N.Y. CPLR 9801 and N.Y. Gen. Mun. Law. §§ 50-e and 50-i, a plaintiff must serve a notice of claim on a municipality within 90 days after the claim arose as "a mandatory condition precedent to bringing a tort claim against [the] municipality." *Tuff v. Village of Yorkville Police Dep't*, No. 16-cv-473, 2017 WL 401241, at *11 (N.D.N.Y. Jan. 30, 2017). That requirement applies to tort suits against officers

sued in their individual capacity if the municipality is required to indemnify the individual officer. *See* N.Y. Gen. Mun. Law. §§ 50-e(1)(b). "Notice of claim requirements 'are construed strictly by New York state courts.' Failure to comply with these requirements ordinarily requires a dismissal for failure to state a cause of action." *Hardy*, 164 F.3d at 793–94 (citations omitted) (quoting *Am. Tel. & Tel. Co. v. N.Y.C. Dep't of Human Res.*, 736 F. Supp. 496, 499 (S.D.N.Y. 1990)).

Although the only notice of claim mentioned in the Complaint is the notice of claim Plaintiffs served on the Village of Clayton on December 5, 2016, (Dkt. No. 33, ¶¶ 6–9), Plaintiffs assert for the first time in their opposition that the notice of claim the Court should consider is the ACD motion they filed on September 8, 2015 in the criminal proceeding against Plaintiff and TI Inn Holdings, (Dkt. No. 54, at 21). As an initial matter, the Court notes that Plaintiffs "may not use opposition to a dispositive motion as a means to amend the complaint." *Avillan v. Donahoe*, 483 F. App'x 637, 639 (2d Cir. 2012) (citing *Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir.1998)). Further, even if the ACD motion were a proper notice of claim—which is highly doubtful—Plaintiffs would run into a statute-of-limitations obstacle. As the Clayton Defendants correctly note, (Dkt. No. 61, at 10), a state law claim notified to the municipality in the notice of claim must be brought "within one year and ninety days after the happening of the event upon which the claim is based." N.Y. Gen. Mun. Law. § 50-i(1). Consequently, a claim notified to the municipality through a September 8, 2015 notice of claim would have to be brought no later than December 7, 2016. Yet Plaintiffs filed this action on January 6, 2017. For purposes of this action, therefore, the Court may only consider state law

claims raised in Plaintiffs' December 5, 2016 notice of claim that arose within the preceding 90-day period—i.e., between September 6, 2016 and December 5, 2016.[36]

The only alleged facts referenced in the notice of claim[37] that could fall within that period are as follows: (1) Zimmer, assisted by Russell, "publicly read prepared statements and made other remarks at public board meetings and in the media" that blamed Plaintiffs for the litigation costs and "mischaracterize[ed] the facts and posture of the case to disparage and discredit" Plaintiffs; (2) Zimmer "defamed [Plaintiffs] by spreading false rumors that [Minnick] is physically abusive to [Weinberg], and has insulted [Minnick] publicly, as he has attempted to communicate with the Village Board in public meetings"; and (3) the civil litigation against Weinberg and TI Inn Holdings continued, and TI Inn Holdings, "under the terms of the ACD",[38] could be "subject to being arbitrarily hauled back into criminal court." (Dkt. No. 50-2, at 7–8). None of these facts go to the claims for abuse of process, civil conspiracy, or legal malpractice,[39] but they are relevant to the claims for defamation, malicious prosecution, and IIED. Nevertheless, as discussed below, none of these allegations sufficiently state a cause of action against Defendants.

On September 12, 2016, Zimmer published Village Board minutes that contained a statement "regarding legal fees for ongoing litigation," stating that the fees were "a necessary

---

[36] With regard to TI Enterprises, Plaintiffs contend in their opposition that it "has not alleged any torts alleging wrongful death, personal injury, or damage to real or personal property, therefore, no Notice of Claim is required with respect to its claims." (Dkt. No. 54, at 21). Whatever the merits of that contention, it is of no moment, as the Complaint does not appear to assert any state law claims on behalf of TI Enterprises.

[37] The Court considers the notice of claim, which the Clayton Defendants attached to their motion papers (Dkt. No. 50-2), as incorporated by reference in the Complaint, (*see* Dkt. No. 33, ¶¶ 6–9).

[38] The ACD was ordered on September 6, 2016, within the notice-of-claim period. (*See* Dkt. No. 33, ¶ 79). Weinberg's dismissal as an "improper defendant" occurred on January 6, 2016, outside the period. (*See id.* ¶ 78).

[39] It bears noting in this regard that the legal malpractice claim is utterly frivolous, given that Plaintiffs do not have an attorney-client relationship with the Menter Defendants.

expense for the case; a settlement was offered, but the defendants chose to go to trial, then

agreed to settle on a previous offer, receiving a conditional discharge," and if "no further

violations occur in the next year, the case will be dropped." (Dkt. No. 33, ¶ 201). Plaintiffs

conclusorily allege that this "statement was intended to, and did, damage Plaintiffs' reputation."

(*Id.*). The Court, however, is hard-pressed to see how this statement is "reasonably susceptible of

a defamatory connotation." *Lenz Hardware, Inc. v. Wilson*, 94 N.Y.2d 913, 914 (2000) (quoting

*Weiner v. Doubleday & Co.*, 74 N.Y.2d 586, 592 (1989)). As the New York Court of Appeals

has instructed:

> Whether particular words are defamatory presents a legal question
> to be resolved by the court in the first instance. The words must be
> construed in the context of the entire statement or publication as a
> whole, tested against the understanding of the average reader, and if
> not reasonably susceptible of a defamatory meaning, they are not
> actionable and cannot be made so by a strained or artificial
> construction.

*Aronson v. Wiersma*, 65 N.Y.2d 592, 593–94 (1985) (citations omitted). A statement "may be

defamatory 'if it tends to expose a person to hatred, contempt or aversion, or to induce an evil or

unsavory opinion of him in the minds of a substantial number of the community.'" *Golub v.

Enquirer/Star Grp., Inc.*, 89 N.Y.2d 1074, 1076 (1997) (quoting *Mencher v. Chesley*, 297 N.Y.

94, 100 (1947)). Even if Zimmer's summary of the criminal proceeding is not completely

accurate, it did not plausibly expose Plaintiffs to public hatred, contempt, ridicule, or disgrace.

Accordingly, Zimmer's public minutes cannot support Plaintiff's libel claim.

With regard to Zimmer's alleged slander of Weinberg and Minnick, the Clayton

Defendants argue that the claim must be dismissed because there are insufficient facts alleged to,

*inter alia*, determine whether the claim is barred by the statute of limitations. Neither the

Complaint nor the notice of claim identifies when Zimmer "orally reported to social worker"

Michelle Grybowski that Minnick was physically abusive of Weinberg. (Dkt. No. 33, ¶ 204; Dkt.

No. 50-2, at 7). Moreover, the notice of claim does not detail how Zimmer "insulted [Minnick] publicly." (Dkt. No. 50-2, at 7). The Complaint alleges that Zimmer said to Minnick at a Village Board meeting: "Go ahead and rant, Brad. You always love the stage." (Dkt. No. 33, ¶ 133). But again, no timeframe is provided. These pleading deficiencies require the dismissal of the slander claim. *Banks v. County of Westchester*, 168 F. Supp. 3d 682, 697 (S.D.N.Y. 2016) (stating that a "complaint must at least identify the allegedly defamatory statements, the person who made the statements, the time when the statements were made, and the third parties to whom the statements were published" (quoting *Germain v. M&T Bank Corp.*, 111 F. Supp. 3d 506, 537 (S.D.N.Y. 2015))).

The third and last allegation that falls within the notice of claim's period is the fact that Defendants continued the civil litigation against Weinberg and TI Inn Holdings, and that TI Inn Holdings remained subject to the terms of the September 6, 2016 ACD order. The civil proceeding, according to the Complaint, is still pending, (Dkt. No. 33, ¶ 68), so it has not been terminated in Plaintiff's favor—thus failing to satisfy an essential element of a malicious prosecution claim. Likewise, an ACD does not qualify as a favorable termination. *See Copeland v. City of New York*, 234 F.3d 1261 (2d Cir. 2000) ("This court has consistently held that an ACD does not constitute such a favorable termination and thus will not support a malicious prosecution claim."). Further, neither the continuation of the civil case against Weinberg and TI Inn Holdings nor the fact that TI Inn Holdings remained subject to the ACD terms can support any of the other state law claims brought by Plaintiffs.[40] In sum, all the state law claims must be dismissed.

---

[40] To the extent that Plaintiffs rely on the three aforementioned facts—publication of the Village Board minutes, Zimmer's oral statements concerning Plaintiffs, and the continued civil litigation and the ACD terms—to support their IIED claim, they fail to state a claim. No IIED "claim will lie where the conduct underlying the claim falls within the ambit of traditional tort liability." *Hansel v. Sheridan*, 991 F. Supp. 69, 75 (N.D.N.Y. 1998). Defamation

## V.       LEAVE TO AMEND

Defendants seek dismissal of the Complaint with prejudice. (Dkt. No. 50-5, at 38; Dkt. No. 52-1, at 44). In general, "[w]hen a motion to dismiss is granted, the usual practice is to grant leave to amend the complaint." *Hayden v. County of Nassau*, 180 F.3d 42, 53 (2d Cir. 1999); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires."). Plaintiffs have sought leave to amend. (Dkt. No. 54, at 29; Dkt. No. 55, at 27). Plaintiffs' state law claims, except for the slander claim, cannot be remedied by better pleading. With regard to Plaintiffs' federal claims against the Clayton Defendants, the double jeopardy claim (Count 6) is irretrievable. Further, no amendment can save Plaintiffs' claims for money damages against Zimmer, Beattie, and Ingerson to the extent that they are sued in their official capacities. *See Jeanty v. City of Utica*, No. 16-cv-966, 2017 WL 6408878, at *10 (N.D.N.Y. Aug. 18, 2017). Accordingly, leave to amend those claims is denied.  *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000). The Court will permit Plaintiffs a limited opportunity to amend the other claims.

## VI.      CONCLUSION

For these reasons, it is hereby

**ORDERED** that the Clayton Defendants' motion to dismiss (Dkt. No. 50) is **DENIED in part** and **GRANTED in part**; and it is further

**ORDERED** that the Menter Defendants' motion to dismiss (Dkt. No. 52) is **GRANTED** in accordance with this Memorandum-Decision and Order; and it is further

**ORDERED** that all the federal claims against the Menter Defendants are **DISMISSED without prejudice**; and it is further

---

is the tort that addresses Zimmer's statements, and malicious prosecution is the tort that addresses whether the pursuit of civil and criminal proceedings is proper; therefore, these two torts displace the IIED claim. *See id.* ("[B]ecause the conduct complained of is squarely addressed by plaintiff's claims for malicious prosecution and assault and battery, his claim for intentional infliction of emotional distress must be dismissed.").

**ORDERED** that all the federal claims against Zimmer, Beattie, and Ingerson for money damages are **DISMISSED with prejudice** to the extent that they are sued in their official capacities; and it is further

**ORDERED** that all the federal claims against Beattie Enterprises are **DISMISSED without prejudice**; and it is further

**ORDERED** that all the federal claims against the Village are **DISMISSED without prejudice**; and it is further

**ORDERED** that the claims against the Village Board, except for the procedural due process claim (Count 1), are **DISMISSED without prejudice**; and it is further

**ORDERED** that the substantive due process claim (Count 2) is **DISMISSED without prejudice**; and it is further

**ORDERED** that the equal protection claim (Count 3) is **DISMISSED without prejudice**; and it is further

**ORDERED** that the takings claim (Count 5) is **DISMISSED without prejudice**; and it is further

**ORDERED** that the double jeopardy claim (Count 6) is **DISMISSED with prejudice**; and it is further

**ORDERED** that the unreasonable search and seizure claim (Count 7) is **DISMISSED without prejudice**; and it is further

**ORDERED** that the *Monell* claim (Count 8) is **DISMISSED without prejudice**; and it is further

**ORDERED** that the state law claims (Counts 9 through 16) are **DISMISSED** as against all Defendants, with the slander claim (Count 14) being dismissed **without prejudice** and the other state law claims being dismissed **with prejudice**; and it is further

**ORDERED** that the Clayton Defendants' motion to dismiss (Dkt. No. 50) is otherwise **DENIED**; and it is further

**ORDERED** that Plaintiffs **may amend the Complaint <u>within THIRTY (30) days</u>** of the date of this Order, in accordance with the conclusions stated above.

**IT IS SO ORDERED.**

Dated: March 21, 2018
      Syracuse, New York

Brenda K. Sannes
U.S. District Judge