**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

JAIME H. WEINBERG, ESQ.; BRADFORD J.
MINNICK; THOUSAND ISLANDS INN HOLDINGS,
LLC; and THOUSAND ISLANDS ENTERPRISES, LLC,       5:17-cv-00021 (BKS/ATB)

                                   Plaintiffs,

v.

VILLAGE OF CLAYTON, NEW YORK; NORMA
ZIMMER, Mayor, Village of Clayton; BOARD OF
TRUSTEES OF THE VILLAGE OF CLAYTON, NEW
YORK; RICHARD INGERSON, Code Enforcement
Officer; and PETER BEATTIE, as administrator of the
ESTATE OF BRUCE BEATTIE,

                                   Defendants.

---

**Appearances:**

*For Plaintiffs:*
Law Office of Jaime H. Weinberg, Esq.
Jaime H. Weinberg
20128 Carr Road Extension
Wellesley Island, NY 13640

*For Defendants:*
Goldberg Segalla LLP
Molly M. Ryan
John P. Coghlan
5786 Widewaters Parkway
Syracuse, NY 13214
Jonathan M. Bernstein
8 Southwoods Boulevard, Suite 300
Albany, NY 12211

**Hon. Brenda K. Sannes, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

# I.   INTRODUCTION

Plaintiffs Jaime H. Weinberg, Bradford J. Minnick, Thousand Islands Inn Holdings, LLC ("TI Inn Holdings"), and Thousand Islands Enterprises, LLC ("TI Enterprises") bring this § 1983 action alleging that Defendants Village of Clayton (the "Village"), Village Mayor Norma Zimmer, the Board of Trustees of the Village (the "Board"), Code Enforcement Officer Richard Ingerson, and Peter Beattie, as administrator of the estate of Bruce Beattie,[1] violated Plaintiffs' free speech, equal protection, and due process rights under the First and Fourteenth Amendments of the United States Constitution. (Dkt. No. 80, ¶ 1). Plaintiffs seek compensatory and punitive damages, as well as injunctive and declaratory relief. (*Id.*). In accordance with this Court's March 21, 2018 decision, (Dkt. No. 79), Plaintiffs filed a Second Amended Complaint (the "SAC") on April 20, 2018, (Dkt. No. 80), and Defendants subsequently moved to dismiss for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure, (Dkt. No. 81). For the reasons set forth below, the motion to dismiss is granted in part and denied in part.

# II.   FACTS

The Court presumes the parties' familiarity with its March 21, 2018 decision, which recites the factual background of this case. (*See* Dkt. No. 79, at 2–16). To the extent that the SAC adds any relevant factual allegations, the Court addresses any such additional facts in the course of discussing the parties' arguments below.[2]

---

[1] According to a suggestion of death filed by Defendants on May 29, 2018, Bruce Beattie died on May 12, 2018. (Dkt. No. 84). Plaintiffs subsequently moved to substitute parties under Rule 25. (Dkt. No. 88). The Court granted the motion on October 30, 2018, substituting Peter Beattie, as administrator of his father's estate, for Bruce Beattie. (Dkt. No. 97).

[2] Plaintiffs attached to their opposition papers six exhibits that they aver are "referenced in, and form an integral part of Plaintiffs' Second Amended Complaint" but were not attached to the SAC. (Dkt. No. 83-1; *see* Dkt. No. 83-2 to -7). "In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may

## III.    DISCUSSION

### A.    Equal Protection Claim (Count 1)

#### 1.    Legal Standard

"The Equal Protection Clause of the Fourteenth Amendment is 'essentially a direction that all persons similarly situated should be treated alike.'" *Diesel v. Town of Lewisboro*, 232 F.3d 92, 103 (2d Cir. 2000) (quoting *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985)). The "prototypical equal protection claim involves discrimination against people based on their membership in a vulnerable class." *Harlen Assocs. v. Incorporated Village of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001). As is relevant here, the Second Circuit has held that gays and lesbians are a "quasi-suspect" class, and classifications based on sexual orientation are subject to "heightened scrutiny." *Windsor v. United States*, 699 F.3d 169, 185 (2d Cir. 2012), *aff'd*, 570 U.S. 744 (2013).

"Where the plaintiff does not allege he is a member of a protected class, his Equal Protection claim may only be based on two theories: selective enforcement or 'class of one.'" *Chizman v. Scarnati*, 218 F. Supp. 3d 175, 181 (E.D.N.Y. 2016). Both require a showing that the plaintiff was treated differently than others similarly situated. *See Harlen*, 273 F.3d at 499. A selective enforcement claim is established if the plaintiff was: (1) "treated differently from other similarly situated individuals, and (2) that such differential treatment was based on 'impermissible considerations, such as race or religion, intent to inhibit or punish the exercise of

---

consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). Further, if "a document is not incorporated by reference, the court may never[the]less consider it where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint." *Id.* (quoting *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006)). The Court has not considered the documents attached to Plaintiffs' opposition as they are not relevant to deciding the motion. *See Homere v. Incorporated Village of Hempstead*, 322 F. Supp. 3d 353, 366 (E.D.N.Y. 2018).

constitutional rights, or malicious or bad faith intent to injure the person.'" *Id.* (quoting *LaTrieste Rest. & Cabaret v. Village of Port Chester*, 40 F.3d 587, 590 (2d Cir. 1994)).[3]

In *Pyke v. Cuomo*, the Second Circuit held that a plaintiff may establish racial discrimination in violation of the Equal Protection Clause without "show[ing] a better treated, similarly situated group of individuals of a different race" by "pointing to [1] a law that expressly classifies on the basis of race, [2] a facially neutral law or policy that has been applied in an unlawfully discriminatory manner, or [3] a facially neutral policy that has an adverse effect and that was motivated by discriminatory animus." 258 F.3d 107, 110 (2d Cir. 2001); *see also Brown v. City of Oneonta*, 221 F.3d 329, 337 (2d Cir. 2000) (explaining that "it is not necessary to plead the existence of a similarly situated non-minority group when challenging a law or policy that contains an express, racial classification" because "[t]hese classifications are subject to strict judicial scrutiny" and "strict scrutiny analysis in effect addresses the question of whether people of different races are similarly situated with regard to the law or policy at issue"). The *Pyke* court explained, however, that a plaintiff advancing "a claim of selective *prosecution* in violation of the Equal Protection Clause must plead and establish the existence of similarly situated individuals who were not prosecuted . . . because courts grant special deference to the executive branch in the performance of the 'core' executive function of deciding whether to prosecute." *Id.* at 109.

## 2. Application

Defendants argue that the equal protection claim fails because of Plaintiffs' "failure to identify similarly situated comparators," which a plaintiff must allege to state an equal protection

---

[3] For a class-of-one claim, a plaintiff must allege that he has been "intentionally treated differently from others similarly situated and no rational basis exists for that different treatment." *Progressive Credit Union v. City of New York*, 889 F.3d 40, 49 (2d Cir. 2018).

claim under a selective enforcement theory. (Dkt. No. 81-1, at 10). Plaintiffs respond that they are not proceeding under a selective enforcement theory but instead allege an equal protection claim "based on discrimination due to [Plaintiffs'] membership in a protected class"—that is, "Minnick's and Weinberg's sexual orientation." (Dkt. No. 83, at 12). Defendants have not responded to Plaintiffs' assertion that they do not need to identify comparators to proceed on their claim that facially neutral laws have been applied against them in an unlawful discriminatory manner. Defendants instead argue that Plaintiffs have failed to plausibly allege discriminatory animus. (Dkt. No. 86, at 3-5).[4]

Defendants further contend that the claim should be dismissed against Zimmer, Beattie, and the Board because the allegations against them are based "on secondhand statements of unidentified individuals and anonymous internet commentators" and are therefore speculative. (*Id.* at 8–9). With regard to Ingerson, Defendants note that the antigay statement attributed to him by a municipal employee[5] "was made in September 2015, more than two months after Ingerson initiated the enforcement action on July 2, 2015"; based on the lack of a "temporal relationship" between the comment and the enforcement action, Defendants assert that Plaintiffs' allegations "do not go beyond raising the sheer possibility that his actions were motivated by discriminatory animus." (Dkt. No. 86, at 4–5). In response, Plaintiffs point to the antigay statement attributed to Ingerson by a municipal employee; disclosure by a family member of Ingerson's that he harbored antigay bias; "Beattie's outing of Plaintiffs' cook to the newspaper as a gay sex offender"; Zimmer's mention at a public meeting that Plaintiffs' cook was a sex offender and her

---

[4] The parties have not addressed the applicability of the law concerning selective prosecution claims. *See Pyke,* 258 F.3d at 109 (noting that a plaintiff who "seeks to prove selective *prosecution* on the basis of race . . . 'must show that similarly situated individuals of a different race were not prosecuted'" (quoting *United States v. Armstrong*, 517 U.S. 456, 465 (1996))); *Raza v. City of New York*, 998 F. Supp. 2d 70, 80 & n.6 (E.D.N.Y. 2013).

[5] As alleged in the SAC, a municipal employee messaged Weinberg on September 9, 2015, indicating that Ingerson did not "speak kindly[] of you, being gay either." (Dkt. No. 80, ¶ 147).

comment that Minnick "doth protested [sic] too much";[6] and "the sense of the community that Defendants were motivated by anti-gay bias." (*Id.* at 14, 16 (quoting Dkt. No. 80, ¶¶ 147, 263–269)).

The Court agrees with Defendants that Plaintiffs have failed to state an equal protection claim against Zimmer, Beattie, the Village, or the Board. Statements made concerning the cook's sex-offender status and Zimmer's retort to Minnick that he "protested too much" do not plausibly raise an inference that Beattie or Zimmer harbored antigay animus against Weinberg and Minnick. Likewise, the Court cannot infer antigay animus based on speculative opinions of community members. However, with regard to Ingerson, at this stage of the proceeding and drawing all reasonable inferences in Plaintiffs' favor, the Court finds that they have plausibly alleged that his actions were motivated by antigay animus, given the municipal employee's September 2015 message to Weinberg that Ingerson did "not speak kindly" of Plaintiffs, "being gay either." (Dkt. No. 80, ¶ 147). It is not unreasonable to infer that Ingerson harbored antigay animus against Weinberg and Minnick in July 2015, even if the municipal employee disclosed that fact a couple of months later.

Further, although the Complaint lacks allegations about similarly situated comparators, Defendants have not responded to the argument that the Complaint sufficiently states a *Pyke* claim that does not require comparator allegations. Specifically, Plaintiffs claim that Ingerson discriminated against them on the basis of sexual orientation by refusing to apply facially neutral procedural safeguards, such as "mandatory inspection, notice, cure period, and hearing provisions related to treatment of unsafe buildings and structure" and "exceptions to building

---

[6] Neither the SAC nor Plaintiff's opposition clearly identifies the subject of the predicate "doth protested [sic] too much." However, reading the statement in context, the Court understands the allegation to be that, when Minnick asked the Board members "if they were going after us 'because we're gay,'" Zimmer repurposed a famous Shakespearian line to state or imply that Minnick "protested too much." (*See* Dkt. No. 80, ¶ 269).

permit requirements." (Dkt. No. 83, at 13). At this stage of the proceeding, the Court denies

Defendants' motion to dismiss the equal protection claim against Ingerson. As explained above,

however, the claim is dismissed as against Zimmer, Beattie, the Village, and the Board; given

that Plaintiffs have already amended their pleading twice and do not seek leave to amend again,

the dismissal is with prejudice.

### B.        Due Process Claims (Counts 2, 3, and 4)

The procedural component of the Fourteenth Amendment's Due Process Clause applies

where there is an alleged deprivation by government action of a constitutionally protected

interest without sufficient procedural safeguards, such as notice and a hearing. *See Zinermon v.*

*Burch,* 494 U.S. 113, 125 (1990). "The first inquiry in every due process challenge is whether

the plaintiff has been deprived of a protected interest in 'property' or 'liberty.'" *Am. Mfrs. Mut.*

*Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999) (quoting U.S. Const. amend. XIV); *see also Spinelli*

*v. City of New York*, 579 F.3d 160, 168 (2d Cir. 2009) ("To succeed on a claim of procedural due

process deprivation under the Fourteenth Amendment—that is, a lack of adequate notice and a

meaningful opportunity to be heard—a plaintiff must first establish that state action deprived him

of a protected property interest."). "Property interests that are protected by the Due Process

Clause of the Fourteenth Amendment are not created by that amendment; they are defined by

'existing rules or understandings that stem from an independent source such as state law.'"

*Spinelli*, 579 F.3d at 168–69 (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)). "Only

after finding the deprivation of a protected interest do we look to see if the State's procedures

comport with due process." *American Manufacturers*, 526 U.S. at 59. To determine what process

is due, courts must balance the three factors set forth in *Mathews v. Eldridge*: (1) "the private

interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of

such interest through the procedures used, and the probable value, if any, of additional or

substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." 424 U.S. 319, 335 (1976).

### 1. Individual Plaintiffs' Property Interests

According to Defendants, Minnick's and Weinberg's due process claims fail because, as limited liability company ("LLC") members of TI Inn Holdings, they lack valid property interests under section 601 of the New York Limited Liability Company Law ("Section 601").[7] (Dkt. No. 81-1, at 13–17). That section provides that a "membership interest in the limited liability company is personal property" and a "member has no interest in the specific property of the limited liability company." N.Y. Ltd. Liab. Co. Law § 601. In opposition, Plaintiffs argue that the property interests of Minnick and Weinberg "emanate from 'existing rules or understandings,' including state law, common law, and history; not the LLC law." (Dkt. No. 83, at 19 (quoting *Bd. of Regents v. Roth*, 408 U.S. at 577.).

Although Plaintiffs are correct that Section 601 does not preclude Minnick and Weinberg from having property interests in the Inn—the provision merely states that LLC membership interests are not interests in the LLC's property—Plaintiff must identify the "independent source" of law that grants them the asserted property interests. *Spinelli*, 579 F.3d at 168–69. They have failed to do so. Plaintiffs do not specify the precise rules or understandings on which they rely, nor do they cite any particular statutory, decisional, contractual, or other legal basis for the asserted property interests. Plaintiffs reference a case in which residents at a senior living facility had a contractual right of occupancy. *See Clare House Bungalow Homes Residents Ass'n*

---

[7] Defendants, however, do not argue that TI Holdings—the owner of the Thousand Islands Inn (the "Inn"), (Dkt. No. 80, ¶ 16)—and TI Enterprises—the Inn's lessee and operator, (*id.* ¶ 19)—lack valid property interests.

*v. Clare House Bungalow Homes, L.L.C.* (*In re Clare House Bungalow Homes, L.L.C.*), No. 09-ap-80164, 2010 WL 5155949, at *2, 2010 Bankr. LEXIS 4661, at *4–5 (Bankr. E.D. Wash. Dec. 14, 2010). The court in that case held that this contractual right was a property interest. *Id.* By contrast, Plaintiffs have not indicated that Minnick and Weinberg have a contractual right to occupy, possess, or enjoy the Inn. In the absence of cognizable property interests, Minnick and Weinberg cannot state a claim for procedural due process. Dismissal is with prejudice for the above-stated reasons.

### 2. Sufficiency of Process

Because Defendants do not dispute that TI Inn Holdings and TI Enterprises (the "Entity Plaintiffs") have valid property interests, the next step in the inquiry is whether the Entity Plaintiffs were afforded sufficient process. Defendants argue that the SAC challenges "random and unauthorized action by a state actor," and that Article 78 of the New York Civil Practice Law and Rules ("Article 78") provided meaningful postdeprivation remedies which Plaintiffs failed to exercise. (Dkt. No. 81-1, at 13–17; Dkt. No. 86, at 8). Plaintiffs respond that they were not required to bring an Article 78 proceeding because Defendants' acts "cannot be considered 'random and unauthorized'" and because seeking relief under Article 78 would have been "unduly burdensome" and "fruitless." (Dkt. No. 83, at 23–24).

"When reviewing alleged procedural due process violations, the Supreme Court has distinguished between (a) claims based on established state procedures and (b) claims based on random, unauthorized acts by state employees." *Hellenic Am. Neighborhood Action Comm. v. City of New York* (*HANAC*), 101 F.3d 877, 880 (2d Cir. 1996). "When the state conduct in question is random and unauthorized, the state satisfies procedural due process requirements so long as it provides meaningful post-deprivation remedy." *Rivera-Powell v. N.Y.C. Bd. of Elections*, 470 F.3d 458, 465 (2d Cir. 2006). The Second Circuit has "held on numerous

occasions that an Article 78 proceeding is a perfectly adequate postdeprivation remedy" to address "a random, arbitrary deprivation of property or liberty." *HANAC*, 101 F.3d at 881, 882. But "where a due process violation is based on an established procedure rather than a random, unauthorized act, the availability of additional process in an Article 78 proceeding does not bar a due process claim but, rather, is a relevant factor in the *Mathews* analysis." *Rothenberg v. Daus*, 481 F. App'x 667, 676 (2d Cir. 2012).

Plaintiffs do not dispute that the Village Code afforded "procedures relating to declaring a building unsafe" and contained "pre-deprivation procedural safeguards in accordance with their own local code." (Dkt. No. 83, at 22). Rather, the thrust of their procedural due process claims is that: (1) Ingerson "failed to comply with [Clayton Village Code] §70-9 to perform any mandated pre-deprivation process, i.e., he did not perform a building inspection, issue a written report of his findings, or provide notice and an opportunity to cure any alleged safety violation prior to declaring the Inn unsafe," (*id.* at 21); and (2) Defendants "failed and refused to provide the post-deprivation process set forth in their own Village Code upon request," more specifically, "in refusing a hearing," (*id.* at 22–23).[8] Relying on *Zinermon v. Burch*, 494 U.S. 113 (1990), Plaintiffs argue that "Ingerson's conduct cannot be considered 'random and unauthorized'" because "Zimmer, the Village Board (including Defendant Beattie) and the Village endorsed, ratified, and authorized Ingerson's actions." (Dkt. No. 83, at 23).

---

[8] The SAC is not entirely clear in distinguishing the three procedural due process claims. Count II, which is against the Village, the Board, and Ingerson, appears to focus on the lack of notice and a hearing in connection with Ingerson's July 2, 2015 letter of violation and the subsequent enforcement/prosecution authorized by the Village and the Board. (*See* Dkt. No. 80, ¶¶ 274–309). Count III, which is against the Village and Ingerson, seemingly centers on the lack of notice, prior to July 2, 2015, in connection with the "uncommunicated" revocation of the Inn's certificate of occupancy as of April 2014. (*Id.* ¶¶ 310–323). Count IV, which is against the Village and Ingerson, apparently zeroes in on the posting of the Inn as unsafe and the concomitant order to vacate the premises. (*Id.* ¶¶ 324–332).

Under Second Circuit law, *Zinermon* has been interpreted to hold that "the acts of high-ranking officials who are 'ultimate decision-maker[s]' and have 'final authority over significant matters,' even if those acts are contrary to law, should not be considered 'random and unauthorized' conduct for purposes of a procedural due process analysis." *Rivera-Powell*, 470 F.3d at 465 (alteration in original) (quoting *Velez v. Levy*, 401 F.3d 75, 91, 92 nn.14–15 (2d Cir. 2005)). The SAC alleges that the Village "denied Plaintiffs their timely requests for a hearing in accordance with . . . Village Code." (Dkt. No. 80, ¶ 298). Section 70-9(B)(3) of the Clayton Village Code provides that an owner served with a notice that a building is unsafe may request, within 30 days of service of such notice, "a hearing before the Village Board of Trustees to consider the validity of the determination made by the Code Enforcement Officer."[9] Taking the allegations in the SAC as true and drawing all reasonable inferences in Plaintiffs' favor, the Court finds that Plaintiffs have plausibly alleged that high-ranking Village officials authorized the challenged acts by denying Plaintiffs a hearing.

Because the SAC sufficiently alleges that the relevant Defendants' actions were not random or unauthorized, the availability of postdeprivation Article 78 remedies is not dispositive of whether Defendants provided the Entity Plaintiffs sufficient process, and that question requires a *Mathews* analysis. Defendants, however, have not briefed the *Mathews* factors. They devote only one paragraph in their reply to the sufficiency-of-process question, simply arguing that Plaintiffs received adequate notice through the July 2, 2015 notice of violation and could request a hearing to contest the violations. (*See* Dkt. No. 86, at 8). But the notice of violation was

---

[9] The Court takes judicial notice of the Code. *See Village of Clayton, NY*, eCode360.com, https://www.ecode 360.com/CL0983.

issued simultaneously with the order to vacate, (*see* Dkt. No. 80, ¶ 174), and the hearing request was denied, (*see id.* ¶¶ 298, 330).

As Defendants failed to analyze the sufficiency of process under the *Mathews* factors, the Court need not decide the issue at this juncture. The Court nevertheless notes that "[a]n essential principle of due process is that a deprivation of . . . property be preceded by notice and opportunity for hearing appropriate to the nature of the case," and that the notice "must be reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Chase Grp. All. LLC v. N.Y.C. Dep't of Fin.*, 620 F.3d 146, 150 (2d Cir. 2010) (internal quotations marks omitted). Accordingly, the Court denies Defendants' motion to dismiss the Entity Plaintiffs' procedural due process claims.

### C.      First Amendment Claim (Count 5)

As the Court previously determined, Plaintiffs have sufficiently alleged a First Amendment retaliation claim with respect to the allegation that Ingerson and Zimmer retaliated against Plaintiffs after Weinberg objected to Ingerson's June 2015 order to remove a celebratory banner on the Inn's front porch. (Dkt. No. 79, at 41–42). Defendants acknowledge that ruling and do not renew their challenge to those allegations. (Dkt. No. 81-1, at 17 & n.4). Defendants, however, move to dismiss all the other First Amendment allegations. The sufficiency of these allegations is analyzed in turn below.

### 1.      Restrictions on Public Comments at Village Board Meetings

The First Amendment of the United States Constitution provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. At its core, "the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 95

(1972). But "the First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981). To determine "whether a state actor violated a plaintiff's First Amendment right to free speech," courts follow "a three-step, forum-based test." *Wandering Dago Inc. v. N.Y. State Office of Gen. Servs.*, 992 F. Supp. 2d 102, 115 (N.D.N.Y. 2014). First, they examine "whether plaintiff's speech is protected by the First Amendment"; second, they determine "the nature of the forum: public, designated or limited public, or nonpublic"; and third, they analyze "whether the defendant's justifications for limiting the plaintiff's speech satisfy the requisite standard." *Id.* (quoting *Piscottano v. Town of Somers*, 396 F. Supp. 2d 187, 200 (D.Conn.2005)).

The SAC alleges that "Minnick repeatedly attempted to plead Plaintiffs' case before public meetings" of the Village Board, but that Zimmer suppressed his speech by changing the rules for public comment, asking the police chief to stay after his report on one occasion "on information and belief because [Minnick and Weinberg] had arrived," and ordering the police chief to "rise to silence" Minnick at a subsequent meeting. (Dkt. No. 80, ¶ 347). Defendants do not argue that Minnick's attempt to discuss "Plaintiffs' case" is unprotected speech; rather, they contend that Plaintiffs have not stated a claim for unlawful restraint on speech because the SAC does not "allege what the new rule is" and fails "to allege that the change to the public comment rules was not reasonable in time, place, and manner or that it did not leave open alternative channels of expression." Plaintiffs respond that the Court's previous decision "acknowledged" that the new rule restricted the discussion of litigation, which they say is a content-based restriction subject to strict scrutiny. (Dkt. No. 83, at 8).

The Court's March 21, 2018 decision recited the facts alleged in the First Amended Complaint (the "FAC"), assuming them to be true. (*See* Dkt. No. 79, at 15–17). The SAC, however, supersedes the FAC and rendered it a nullity. *See Int'l Controls Corp. v. Vesco*, 556 F.2d 665, 668 (2d Cir. 1977) ("It is well established that an amended complaint ordinarily supersedes the original and renders it of no legal effect."); *Darvie v. Countryman*, No. 08-cv-715, 2009 WL 161219, at *1, 2009 U.S. Dist. LEXIS 107565, at *2–3 (N.D.N.Y. Jan. 22, 2009) ("The filing of Plaintiff's Amended Complaint renders his original Complaint a nullity."); *cf.* L.R. 7.1(a)(4) ("[A] proposed amended pleading must be a complete pleading, which will supersede the pleading sought to be amended in all respects."). Thus, the Court only considers the allegations in the SAC for purposes of evaluating the present claim. Although Plaintiffs ask the Court to consider "Exhibit B," which they assert is "integral" to the SAC, (Dkt. No. 83-1, ¶ 7), the Court need not do so because the SAC alleges sufficient facts to allow a plausible inference that the new rule implemented by Zimmer barred discussion of pending litigation. Indeed, the SAC alleges that Minnick tried to discuss "Plaintiffs' case," but Minnick "would not even be allowed to be heard" because of the new rule. (Dkt. No. 80, ¶ 347). Therefore, viewing the allegations as true and drawing all reasonable inferences in Plaintiffs' favor, the Court finds that the SAC plausibly alleges that Zimmer restricted Plaintiffs' protected speech at Village Board meetings.

The inquiry does not end here, however, because not all restrictions on protected speech violate the First Amendment. Village Board meetings are deemed to be a limited public forum. *See Devine v. Village of Port Jefferson*, 849 F. Supp. 185, 189 (E.D.N.Y. 1994) ("Because the Village held open meetings, inviting public discourse on the matters at hand, this Court views those meetings as a limited public forum for first amendment analysis"). "Reasonable time, place

and manner restrictions on speech in limited public fora comport with the Constitution so long as they are content-neutral, serve a significant government interest and leave open alternative channels for expression." *Brenchley v. Village of Phoenix*, No. 01-cv-190, 2005 WL 2437027, at *3, 2005 U.S. Dist. LEXIS 48212, at *9–10 (N.D.N.Y. Sept. 30, 2005). In a limited public forum, discussion of certain topics is permissibly limited as long as the exclusion is viewpoint neutral and reasonable. *See Smith v. City of Middletown*, No. 09-cv-1431, 2011 WL 3859738, at *5, 2011 U.S. Dist. LEXIS 98601, at *10–12 (D. Conn. Sept. 1, 2011), *aff'd sub nom. Smith v. Santangelo*, 518 F. App'x 16 (2d Cir. 2013) ("In a limited public forum, 'a government entity may impose restrictions on speech that are reasonable and viewpoint-neutral.'" (quoting *Pleasant Grove City v. Summum*, 555 U.S. 460, 470 (2009))); *Malta v. Slagle*, No. 05-cv-342, 2007 WL 952045, at *3, 2007 U.S. Dist. LEXIS, at *9–10 (W.D.N.Y. Mar. 29, 2007) ("The First Amendment generally permits the government to exclude a topic from discussion in a limited public forum, provided that the exclusion is viewpoint neutral and reasonable."). Defendants argue that the SAC does not contain any allegations plausibly indicating that Zimmer's restriction of Plaintiffs' speech was unreasonable or otherwise discriminated against certain viewpoints. At this early stage of the litigation, however, the Court must draw all reasonable inferences in Plaintiffs' favor, and it may be inferred that Zimmer implemented new public comment rules and used the chief of police to selectively silence Plaintiffs' viewpoints. Accordingly, Plaintiffs have sufficiently stated a First Amendment claim.

## 2. October 2014 Halloween Sign

Plaintiffs allege that Ingerson retaliated against them in violation of the First Amendment for posting a "Haunted Hotel Cancelled Due to Nanny State" message on their marquee sign and social media accounts in October 2014. (Dkt. No. 80, ¶¶ 100–105, 353). To state a First Amendment retaliation claim, a plaintiff must plead that: (1) the plaintiff's speech or conduct at

issue was protected; (2) the defendant took adverse action against the plaintiff; and (3) there was a causal connection between the protected speech and the adverse action. *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009). "A plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action." *Espinal*, 558 F.3d at 129.

Despite the lack of temporal proximity between Ingerson's July 2, 2015 actions against Weinberg and the October 2014 event, Plaintiffs assert that "there is evidence to indicate that [Ingerson] carried a lingering grudge against [Weinberg] for this incident well into 2016." (*Id.* ¶ 353). In particular, they point to "some very nasty and defensive on-line comments to a March, 2016 article in the Watertown Times," which they attribute to Ingerson "or someone very close to him" because the comments "contain non-public knowledge of the details of the code enforcement matter and knowledge of, and a strong negative opinion related to, the otherwise long-forgotten 'Haunted Hotel' incident." (*Id.*). The Court agrees with Defendants that the attribution of the comment to Ingerson is entirely speculative. (*See* Dkt. No. 81-1, at 22). Further, even if Ingerson was the commenter, the March 2016 comment would be too tenuous a basis for the Court to reasonably infer that Ingerson's July 2015 actions were caused by a "lingering grudge" based on events taking place nine months earlier. Accordingly, the First Amendment retaliation claim fails to the extent it is premised on the October 2014 speech.

### 3.     "Threats" by Village Attorneys

According to the SAC, Zimmer retaliated against Plaintiffs for advocating their case through social media and the press. (Dkt. No. 80, ¶¶ 336–343). As Defendants correctly point out, (Dkt. No. 81-1, at 22), Plaintiffs do not allege that Zimmer herself engaged in retaliatory acts. Instead, the SAC asserts that: (1) a Village attorney "contacted Plaintiffs['] attorney, accused Plaintiffs of running a 'vituperative social media campaign,' and threatened that

Plaintiffs continuing to do so would be detrimental to Plaintiffs in the underlying litigation and in any settlement discussions," (Dkt. No. 80, ¶ 342); (2) another Village attorney called Plaintiffs' lawyer and "touted that he had 'gotten [Plaintiffs] on occupancy' because of the cook's sex offender registry information," (*id.* ¶ 343); and (3) "allies of the community warned [Plaintiffs] that 'it would not be good for them' to show up at Village Board meetings," (*id.*). Not only do Plaintiffs fail to connect these actions to Zimmer, but they also fail to show that this third-party conduct is actionable.[10] *See Bumpus v. Canfield*, 495 F. Supp. 2d 316, 326 (W.D.N.Y. 2007) ("[V]ague intimations of some unspecified harm generally will not rise to the level of adverse action for the purpose of a First Amendment retaliation claim."). Therefore, any First Amendment retaliation claim based on these allegations fails.

### 4.    Confidentiality Provision

Plaintiffs allege that Zimmer sought to suppress Plaintiffs' speech by requesting a confidentiality provision as a prerequisite to settling litigation between the parties. (*Id.* ¶ 346). This provision implicates the First Amendment according to Plaintiffs because Zimmer's "focus on confidentiality indicates her ardent desire to restrain Plaintiff's speech about what its government did to them." (*Id.*). Defendants argue that a mere "desire to suppress speech is not the suppression of speech." (Dkt. No. 81-1, at 23). Plaintiffs do not respond to that argument or cite any authority to support First Amendment liability on those facts. Accordingly, the First Amendment claim is dismissed to the extent it is based on the aforementioned allegations.

---

[10] The SAC also alleges that a Village attorney sent Plaintiffs a letter in September 2015, threatening to condemn the Inn if Plaintiffs went forward with plans to hold a "second annual 'Jazz Fest' event inside the building." (Dkt. No. 80, ¶ 230, *see also id.* ¶¶ 231–234, 352). But Plaintiffs do not allege that they were planning to hold the 2015 Jazz Fest inside; instead, "they had already elected to . . . hold the event outside in a tent." (*Id.* ¶ 232). Therefore, as explained in the Court's prior decision, Plaintiffs have failed to allege a restriction on speech. (*See* Dkt. No. 79, at 22–23). Additionally, the absence of any allegation plausibly connecting the Village attorney's letter to Zimmer defeats the First Amendment retaliation theory newly asserted in Plaintiffs' opposition. (*See* Dkt. No. 83, at 9–10).

### D. Claims Against the Village

Defendants move to dismiss all claims against the Village on the grounds that "plaintiff have abandoned their *Monell* claim" and failed to allege "a Village custom, policy, or practice [that] deprived plaintiffs of a constitutional right." (Dkt. No. 81-1, at 5–6). Plaintiffs respond that a *Monell* claim "is not a pre-requisite for establishing §1983 municipality liability"; instead, "Plaintiffs seek to hold the Village and the Village Board directly liable for their own acts and omissions—not for the acts and omissions of those that the Village and Board employed simply because they employed them." (Dkt. No. 83, at 25). In support of this legal theory, Plaintiffs point to the Court's previous ruling that claims against Village officers in their official capacity are claims against the Village itself. (*See id.*).

A municipality may be held liable under § 1983 "if the conduct that caused the unconstitutional deprivation was undertaken pursuant to 'a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers . . . [or] pursuant to governmental "custom" even though such a custom has not received formal approval through the body's official decisionmaking channels.'" *Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir. 2000) (alteration in original) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978)). "The municipality cannot properly be held liable in such an action unless the injury was inflicted by [its] lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Id.* (alteration in original) (internal quotation marks omitted). Further, if the plaintiff does not contend that the challenged actions "were taken pursuant to a local policy that was formally adopted or ratified but rather that they were taken or caused by an official whose actions represent official policy, the court must determine whether that official had final policymaking authority in the particular area involved." *Id.*

The only remaining claims against the Village are the due process claims (Counts II, III, and IV). With regard to those claims, Plaintiffs allege that Mayor Zimmer and the Village Board authorized Ingerson to deprive Plaintiffs of their property interests without due process and refused to grant Plaintiffs a hearing to challenge the deprivation. (See Dkt. No. 80, ¶¶ 22, 27, 204, 214, 298, 330, 332). There can be no dispute that the Village Board has final policymaking authority with regard to enforcement of the Village Code. *See* Village of Clayton Code § 70-9(B)(3) ("[T]he owner may request a hearing before the Village Board of Trustees to consider the validity of the determination made by the Code Enforcement Officer."); *cf. also Patterson v. City of Utica*, 370 F.3d 322, 331 (2d Cir. 2004) ("[S]ince the City concedes that its mayor is a high-ranking official with final policymaking authority in the municipal employment area at issue in this case, the City can, pursuant to § 1983, be held liable for the actions of its mayor."); *Clark v. City of Oswego*, No. 03-cv-202, 2007 WL 925724, at *8 (N.D.N.Y. Mar. 26, 2007) ("Here, there is little doubt that defendants have final policymaking authority for the City: the Common Council is the City's legislative body and the Mayor has limited legislative duties as well."). Therefore, Plaintiffs have sufficiently pled that these officials' actions were the policy of the Village. Defendants' motion to dismiss the claims against the Village is denied.

### E.    Punitive Damages

Defendants request that the claim for punitive damages against the Village and Board be stricken. (Dkt. No. 81-1, at 24). As it is well established that "a municipality is immune from punitive damages under 42 U.S.C. § 1983," *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981), the request is granted. Further, Defendants contend that "Plaintiffs' allegations against Zimmer, Ingerson, and Beattie do not rise to the level of morally reprehensible conduct necessary to maintain a claim for punitive damages." (Dkt. No. 81-1, at 25). There are, however,

no remaining claims against Beattie, and the allegations in the SAC regarding Zimmer and Ingerson are plainly sufficient. The request to strike is denied in that respect.

### F. Injunctive Relief

Defendants seek the dismissal of Plaintiffs' request for injunctive relief on the grounds that "Plaintiffs have not alleged an irreparable harm that cannot be remedied by an award of monetary damages." (Dkt. No. 81-1, at 25–26). But Defendants' arguments are contingent upon a factual assessment that is ill-suited for determination at the motion-to-dismiss stage. (*See id.* (arguing that "although plaintiffs assert they have been deprived of their right to use and occupy the Inn, this is not factually accurate")). Further, neither party's briefing analyzes the specific injunctive relief sought in the SAC. Therefore, the Court denies Defendants' motion to dismiss the request for injunctive relief as premature.

## IV. CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendants' motion to dismiss under Rule 12(b)(6) (Dkt. No. 81) is **DENIED in part** and **GRANTED in part** in accordance with this Memorandum-Decision and Order; and it is further

**ORDERED** that Plaintiffs' equal protection claim (Count I) contained in the Second Amended Complaint (Dkt. No. 80) is **DISMISSED with prejudice** as against Zimmer, Beattie, the Village, and the Board (Count I is not dismissed as to Ingerson); and it is further

**ORDERED** that Plaintiffs Minnick's and Weinberg's due process claims (Counts II, III, and IV) contained in the Second Amended Complaint (Dkt. No. 80) are **DISMISSED with prejudice**; and it is further

**ORDERED** that certain of Plaintiffs' First Amendment speech suppression and retaliation claims (Count V)—i.e., the claims based upon the October 2014 Halloween message,

the alleged "threats" from Village attorneys, and a confidentiality provision—are **DISMISSED**

**with prejudice**; and it is further

    **ORDERED** that the prayer for punitive damages against the Village and the Board is

**STRICKEN**; and it is further

    **ORDERED** that Defendant Peter Beattie, as administrator of the estate of Bruce Beattie,

is dismissed as a Defendant from this action; and it is further

    **ORDERED** that Defendants' motion to dismiss (Dkt. No. 81) is otherwise **DENIED.**

    **IT IS SO ORDERED.**

Dated: November 2, 2018
       Syracuse, New York

Brenda K. Sannes
U.S. District Judge