**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**JAIME H. WEINBERG, ESQ.;**
**BRADFORD J. MINNICK; THOUSAND**
**ISLANDS INN HOLDINGS, LLC; and**
**THOUSAND ISLANDS ENTERPRISES,**
**LLC,**

                                    **Plaintiffs,**

**v.**                                                 **5:17-CV-0021 (NAM/ATB)**

**VILLAGE OF CLAYTON, NEW YORK;**
**NORMA ZIMMER, Mayor, Village of Clayton;**
**BOARD OF TRUSTEES OF THE VILLAGE**
**OF CLAYTON, NEW YORK; and RICHARD**
**INGERSON, Code Enforcement Officer,**

                                    **Defendants.**
_____

**Appearances:**

*For Plaintiffs:*
Law Office of Jaime H. Weinberg, Esq.
Jaime H. Weinberg
20128 Carr Road Extension
Wellesley Island, NY 13640

*For Defendants:*
Goldberg Segalla LLP
Molly M. Ryan, John P. Coghlan
5786 Widewaters Parkway
Syracuse, NY 13214

**Hon. Norman A. Mordue, Senior U.S. District Court Judge:**

### MEMORANDUM-DECISION AND ORDER

### I.    INTRODUCTION

       Plaintiffs Jaime H. Weinberg, Bradford J. Minnick, Thousand Islands Inn Holdings, LLC,

and Thousand Islands Enterprises, LLC bring this action pursuant to 42 U.S.C. § 1983, alleging

that Defendants Village of Clayton, Village Mayor Norma Zimmer, and Code Enforcement

Officer Richard Ingerson violated Plaintiffs' free speech, equal protection, and due process rights

under the First and Fourteenth Amendments of the United States Constitution.  (Dkt. No. 80).

Currently pending before the Court are Plaintiffs' Motion for Partial Summary Judgment and

Defendants' Cross-Motion for Summary Judgment.  (Dkt. Nos. 131–32).

## II.    BACKGROUND[1]

### A.    The Thousand Islands Inn

The Thousand Islands Inn (the "Inn") was constructed in 1897 and operated through

September 2013.  (Dkt. No. 80, ¶ 30).  Plaintiffs Weinberg and Minnick purchased the Inn on

December 19, 2013 and vested title to Thousand Islands Inn Holdings, LLC.  (*Id.*, ¶ 35).

Weinberg and Minnick own Thousand Islands Inn Holdings, LLC and are the proprietors of the

Inn.  (Dkt. No. 131-2, ¶ 3).  The Inn formerly featured two floors of lodging, a restaurant, a bar,

and a kitchen.  (*Id.*, ¶ 4).  Thousand Islands Holdings, LLC entered into a ten-year lease with

Thousand Islands Enterprises, LLC, with the latter to use the property to operate a hotel, bar and

restaurant.  (Dkt. No. 132-5, pp. 294–96).  Plaintiffs' initial plan was to redecorate the Inn during

the Spring of 2014 and then re-open for the 2014 tourist season.  (Dkt. No. 80, ¶ 47).  To assist

with this work, Plaintiffs hired Absolute Construction as their contractor.  (*Id.*, ¶ 50).

---

[1] The facts stated herein are drawn from the parties' submissions, including Plaintiffs' Statement of
Material Facts, Dkt. No. 131-1; Defendants' Statement of Material Facts, Dkt. No. 132-19; and the
exhibits they have submitted, to the extent that they are admissible as evidence.  Notably, Plaintiffs failed
to respond directly to Defendants' Statement of Material Facts, as required by N.D.N.Y. L.R. 56.1(b).
Although Plaintiffs are represented by Mr. Weinberg, acting *pro se*, he is an admitted lawyer and should
know better.  Under these circumstances, the Court may deem admitted any properly supported facts set
forth in Defendants' Statement of Material Facts.  Nonetheless, the Court has conducted an assiduous
review of the record in deciding the pending motions.

### B.       Renovations Begin

In April 2014, Absolute Construction identified a structural problem with the west wall of the Inn, specifically that it was supported by compromised studs.  (Dkt. No. 132-14, p. 16).  The studs in the western wall provided structural support for the entire building, carrying the load of the 2nd and 3rd floors and the roof.  (Dkt. No. 132-12, p. 24).  Grater Architects developed a plan to install temporary shoring for the west wall that would stabilize the structure while permitting additional work to move forward.  (*Id.*).

Plaintiffs obtained the necessary building permit, and Absolute Construction completed the temporary shoring work, which helped to ensure the 2nd and 3rd floors were properly supported.  (Dkt. No. 132-7, pp. 212–16; Dkt. No. 132-14, p. 17).  Absolute Construction also worked on the Inn's outdated electrical system, among other things disconnecting power from all parts but the kitchen.  (Dkt. No. 132-14, p. 11).  Absolute Construction later ran power to the bar, dining, and kitchen areas, but the second and third floors remained disconnected.  (*Id.*, p. 25).

### C.       Open for Takeout

Plaintiffs opened a take-out window for the 2014 season, but the hotel, dining room, and bar area of the Inn remained closed.  (Dkt. No. 80, ¶¶ 68–70).  Defendant Ingerson, the Village of Clayton's Code Enforcement Officer, granted Plaintiffs a temporary certificate of occupancy which permitted them to use the kitchen of the Inn.  (*See* Dkt. No. 132-6, p. 23).

### D.       Plans & Problems

As part of their plan to renovate the Inn, Plaintiffs consulted with architects regarding what would be needed to meet code requirements.  (Dkt. No. 80, ¶ 117).  The architects advised that Plaintiffs would need to install an automatic sprinkler system to meet the Existing Building Code of New York.  (Dkt. No. 132-11, p. 78; Dkt. No. 132-13, p. 107).  Plaintiffs asked the State

for a variance to use a different type of automatic sprinkler, and Ingerson supported the request, but it was denied.  (Dkt. No. 132-7, p. 131).

In December 2014, Plaintiffs received a large State grant for development of the Inn.  (Dkt. No. 80, ¶ 118).  As a result, Plaintiffs expanded their planned renovations.  (Dkt. No. 132-6, p. 25).  The grant required Plaintiffs to bid out the work to be done at the Inn; Plaintiffs put the work out to bid, but they only received two bids which exceeded their architects' estimates.  (Dkt. No. 80, ¶¶ 122, 124).  Consequently, the renovations stalled.  (*Id.*, ¶ 126).

### E.     The 2015 Season

Plaintiffs again operated a take-out window for the 2015 season.  (Dkt. No. 80, ¶ 126).  On June 22, 2015, Minnick hung a banner on the front of the Inn to congratulate Weinberg on his admittance to the New York Bar.  (*Id.*, ¶ 349).  Ingerson requested that Weinberg remove the banner, on the basis that banners are illegal in the Village of Clayton.  (Dkt. No. 132-7, p. 119).  Weinberg subsequently complained to Mayor Zimmer about the incident.  (*Id.*).  Ingerson testified that he did not know that Weinberg had complained to Mayor Zimmer about the banner incident.  (*Id.*, p. 120).

In late June, Weinberg and Minnick gave permission to the Inn's cook to stay overnight in the building.  (Dkt. No. 131-2, ¶ 5; Dkt. No. 132-6, p. 32).  Ingerson testified that on July 1, 2015, he received a citizen complaint that someone was occupying the second floor of the Inn.  (Dkt. No. 132-7, pp. 19–21).  Ingerson spoke with Weinberg on July 2, 2015, and Weinberg admitted that the cook occasionally slept at the Inn.  (*Id.*, p. 24).  Ingerson advised Weinberg that for safety reasons the individual was not permitted to sleep at the Inn, and Ingerson told Weinberg to remove the cook and not let him sleep there.  (*Id.*, pp. 24, 41).  Weinberg refused

and told Ingerson that he did not believe that there was any legal basis for removing the cook, and that "[i]f that's what the law is, it's a stupid law."  (Dkt. No. 132-6, p. 31).

### F.     Official Reprimand

Within hours of the cook dispute, Ingerson issued Weinberg a Letter of Violation, an Appearance Ticket, and he posted a Notice stating the Inn was unsafe for occupancy, with the exception of the kitchen.  (Dkt. No. 131-3; Dkt. No. 131-4; Dkt. No. 131-5).  The Letter of Violation stated that the Inn did not "meet the codes allowed by law to be occupied," and alleged violations of Town of Clayton Local Law #2 section 7(a), 19 NYCRR Part 1203.3 (no certificate of occupancy), New York State Fire Code Section 107.2, and New York State Property Maintenance Code Section 107.1.3.  (Dkt. No. 131-4).  The Letter ordered Plaintiffs "to vacate any part of the structure other than the kitchen," and that Plaintiffs could only "enter the structure for the purpose of repair or construction."  (*Id.*).  The Notice stated that the Inn was "deemed unsafe" for occupancy except the kitchen.  (Dkt. No. 131-3).  The Appearance Ticket charged Weinberg with violating the above laws and gave him a court date.  (Dkt. No. 131-5).

Because the documents were initially issued in error in the name of the Town of Clayton, on July 13, 2020, Ingerson re-issued the Letter of Violation, Notice, and Appearance Ticket in the name of the Village of Clayton.  (Dkt. No. 131-6; Dkt. No. 131-7; Dkt. No. 131-8).  Weinberg was given a court date of July 23, 2015.  (Dkt. No. 131-8).

### G.     Escalation

Despite the Letter, Notice, and Appearance Ticket, Plaintiffs continued to permit their cook to sleep at the Inn.  (Dkt. No. 131-2, ¶ 5; Dkt. No. 132-6, p. 35).  On July 23, 2015, Weinberg was arraigned on the Appearance Ticket and provided with an Information that charged him with violating provisions of Chapter 70, Section 70-7 of the Village of Clayton

Code, in that he "had illegally and without authorization" allowed the cook to occupy a space on the second floor of the Inn and that Weinberg refused to comply with Ingerson's order to remove the cook.  (Dkt. No. 131-20).  On July 24, 2015, Ingerson set up a camera to document instances when the cook parked at the Inn outside the hours of the kitchen's operation.  (Dkt. No. 131-14, p. 15).  On July 29, 2015, Thousand Islands Holdings, LLC requested a hearing pursuant to Section 70-9 of the Village of Clayton Code, which pertains to unsafe buildings and structures. (Dkt. No. 131-11).  The Village declined to hold a hearing, stating in relevant part that "the provision permitting a building owner to request a hearing is found in Section 70-9, which applies only when a building owner has been served with an order to repair or demolish or remove an unsafe building."  (Dkt. No. 131-12).

On August 10, 2015, the Village Board adopted a resolution that authorized the commencement of criminal and civil actions against Weinberg and Thousand Islands Holdings, LLC.  (Dkt. No. 132-7, pp. 242–43).  On August 20, 2015, Ingerson issued to Plaintiffs a Combined Notice of Violation and Compliance Order, which identified the applicable code provisions that Plaintiffs were allegedly violating by permitting the cook to sleep at the Inn. (Dkt. No. 132-7, pp. 259–61).  The Order gave Plaintiffs 10 days to remove any persons occupying the Inn and 30 days to install the automatic sprinkler system and smoke alarms to bring the building to code.  (*Id.*).  Nonetheless, Plaintiffs permitted the cook to sleep at the Inn through Labor Day of 2015.  (Dkt. No. 132-6, p. 32).

On September 2, 2015, Weinberg and Thousand Islands Inn Holdings, LLC were charged in a Superseding Information with 22 criminal misdemeanors pertaining to alleged building code violations at the Inn.  (Dkt. No. 131-14; Dkt. No. 131-15).  At the same time, they were sued in a civil proceeding by the Village of Clayton.  (Dkt. No. 131-16).

### H.      Relevant Code Sections

The Village of Clayton Code ("the Code") has several sections which govern code enforcement, certificates of occupancy, and unsafe buildings and structures.  First, the Code states that the Code Enforcement Officer shall review and approve or disapprove building permits and certificates of occupancy; conduct inspections; review and investigate complaints; and pursue legal actions to enforce the Code.  (Dkt. No. 131-9, pp. 3-4).  Section 70-7 of Code further states that:

> Certificates of occupancy/certificates of compliance required.  A certificate of occupancy/certificate of compliance shall be required for any work which is the subject of a building permit and for all structures, buildings, or portions thereof which are converted from one use or occupancy classification or subclassification to another.  In addition, a certificate of compliance will be deemed required under this chapter when required by the provision of any Village of Clayton local law.  Permission to use or occupy a building or structure, or portion thereof, for which a building permit was previously issued shall be granted only by issuance of a certificate of occupancy/certificate of compliance.

> Issuance of certificates of occupancy/certificates of compliance.  The Code Enforcement Officer shall issue a certificate of occupancy/certificate of compliance if the work which was the subject of the building permit was completed in accordance with all applicable provisions of the Uniform Code and Energy Code and, if applicable, the structure, building or portion thereof that was converted from one use or occupancy classification or subclassification to another complies with all applicable provisions of the Uniform Code and Energy Code.

(*Id.*, pp. 9–10).  Section 70-9 of the Code states that:

> Demolition and removal or repair by owner.  Upon the making of a written report by the Code Enforcement Officer that the building or structure is unsafe or dangerous to the public, the Code Enforcement Officer shall serve a notice upon the owner and all other persons having an interest in such property or structure as appearing in the real property records at the Jefferson County Clerk's Office, either personally or by registered and certified mail, return receipt requested, addressed to their last known addresses as shown by the records of the Town Assessor and/or in the office of the County Clerk, containing a description of the premises, a statement of particulars in which the building or structure is unsafe or dangerous and an order of the Code Enforcement Officer requiring the same to be repaired or demolished and removed.  If such service is made by registered and

7

certified mail, return receipt requested, the notice shall also be posted on the premises.

Such owner so served shall commence the repair or demolition and removal of such building or structure within 30 days after service of such notice, and shall complete the same within the time specified in such notice.

At any time prior to the expiration of 30 days following service of the notice provided in Subsection B(1), the owner may request a hearing before the Village Board of Trustees to consider the validity of the determination made by the Code Enforcement Officer.

At the hearing, the owner, the Village and any other interested parties may present witnesses and any other proof relating to the matter, and all parties may appear in person or with their attorneys.

Within five days of the conclusion of the hearing, the Village Board of Trustees shall make a determination, in writing, and a copy of the same shall be served either personally or by registered and certified mail, return receipt requested, to all parties who appear therein.

The determination shall state whether the original report is sustained, modified, or reversed. If reversed, no further proceeding shall be held.

If the original report is sustained, in whole or in part, the Village Board of Trustees shall also include an order directing the owner to proceed in accordance therewith and shall further specify that unless the work is commenced within 10 days after service and completed within a reasonable time thereafter, which the Village Board of Trustees shall designate, the penalties hereinafter provided shall be invoked.

The notice from the Code Enforcement Officer under Subsection B(1) of this section shall be filed in the office of the Jefferson County Clerk, in the same manner as the notice of pendency, pursuant to Article 65 of the Civil Practice Law and Rules. Such a notice so filed shall be effective for a period of one year from the date of filing. However, said notice may be vacated upon the order of a judge or justice of a court of record or upon the consensus of the Village Attorney.

(*Id.*, p. 12).

## I.    Comments

Plaintiffs Weinberg and Minnick are openly gay and long-time life partners. (Dkt. No. 80, ¶¶ 12, 15). Janet Sullins, the Deputy Clerk of the Village of Clayton, testified that Ingerson

once referred to Weinberg as a "fudge packer" and routinely made comments about gay people who had entered the Village's offices.  (Dkt. No. 136-5, pp. 2–3).

### J.    Village Board Meetings

Plaintiffs Weinberg and Minnick attended Village Board meetings periodically in 2015 and 2016 to communicate with Mayor Zimmer and the Board about the Inn.  (Dkt. No. 132-5, p. 160; Dkt. No. 132-6, p. 48).  On September 10, 2015, Minnick spoke at a Board meeting "regarding the lack of due process and expressing disgust regarding the Board's actions in passing a resolution to begin legal action against him and [Weinberg] for code violations."  (Dkt. No. 131-28, p. 2).  According to the meeting minutes, Mayor Zimmer "responded that this is a pending legal matter and any questions must be directed to the Village Board."  (*Id.*).

On February 8, 2016, Minnick attended a Village Board meeting to apprise the new Board members of the Inn situation, and "there was substantial discussion of the matter by those present."  (Dkt. No. 131-28, p. 5).  Mayor Zimmer and the Board "responded that they are prohibited from discussing the matter due to ongoing litigation."  (*Id.*).  On or about February 22, 2016, the Village Board implemented written Guidelines for Public Comment, and among other things, public comment was limited to five minutes per person.  (Dkt. No. 131-26; Dkt. No. 131-27; Dkt. No. 132-16, p. 33).  On March 14, 2016, Mayor Zimmer read a statement about the Inn, which described the ongoing litigation and stated that "no public comment will be allowed regarding this topic."  (Dkt. No. 131-30, p. 2).

At another meeting on June 13, 2016, Minnick spoke about the Inn situation and criticized Mayor Zimmer's statement; when his five minutes were up, Mayor Zimmer told him to stop, but he continued speaking.  (Dkt. No. 132-2, pp. 100–02; Dkt. No. 132-4, pp. 35–36).  At that point, the Mayor turned to the Chief of Police and "had him stand up" to cut Minnick off.

(*Id.*).  According to Weinberg, the five-minute rule "has only been adhered to in this one case."

(Dkt. No. 132-4, p. 36).  Minnick also stated that he was not aware of "any other instance where

somebody was cut off."  (Dkt. No. 132-5, p. 176).  Later in June of 2016, the Village Board

revised the public comment rules to preclude discussion on matters "under current litigation."

(*See* Dkt. No. 131-32, p. 2).  Minnick and Weinberg rarely, if ever, returned to Board meetings

after the rule was adopted.  (Dkt. No. 132-6, p. 49).

### K.    Litigation

The criminal charges against Weinberg were ultimately dismissed, while the criminal

charges against Thousand Islands Inn Holdings, LLC were adjourned in contemplation of

dismissal.  (Dkt. No. 132-6, p. 2).  The civil action brought by the Village has settled.  (*Id.*).

Plaintiffs never brought an Article 78 action in New York State Court regarding their grievances

against the Village of Clayton.  (*Id.*, p. 37).  Plaintiffs commenced this action on January 6, 2017.

(Dkt. No. 1).  The Inn remains closed.

## III.    STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if

all the submissions taken together "show that there is no genuine issue as to any material fact and

that the moving party is entitled to judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477

U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

The moving party bears the initial burden of demonstrating "the absence of a genuine issue of

material fact."  *Celotex*, 477 U.S. at 323.  A fact is "material" if it "might affect the outcome of

the suit under the governing law," and is genuinely in dispute "if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248; *see*

*also Jeffreys v. City of New York*, 427 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*).  The

movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (summary judgment appropriate where the non-moving party fails to "come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on an essential element of a claim") (internal quotation marks omitted).

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323–24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. United States Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (citation omitted). Furthermore, "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Upon cross-motions for summary judgment, the Court must "in each case constru[e] the evidence in the light most favorable to the nonmoving party." *Krauss v. Oxford Health Plans, Inc.*, 517 F.3d 614, 621–22 (2d Cir. 2008) (citation omitted).

## IV.    DISCUSSION

Plaintiffs' remaining Section 1983 claims are as follows: 1) violation of the Fourteenth Amendment right to equal protection, against Defendant Ingerson (Claim One); 2) violation of the Fourteenth Amendment right to procedural due process, against the Village and Ingerson (Claims Two, Three, and Four); and 3) violation of the First Amendment right to free speech, against Defendants Zimmer and Ingerson (Claim Five).  (Dkt. Nos. 80, 98).  Plaintiffs seek summary judgment on their due process and free speech claims, while Defendants move against all of Plaintiffs' claims.  (Dkt. Nos. 131–32).  The Court will address each claim in turn.

### A.    __Equal Protection Claim__

Plaintiffs' Equal Protection claim alleges that Defendant Ingerson, the Village's Code Enforcement Officer, took wrongful action against Weinberg, Minnick, and their Inn because of Plaintiffs' sexual orientation.  (Dkt. No. 80, p. 57; Dkt. No. 98, p. 7).

### 1.    Legal Standard

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike."  *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (quoting U.S. Const. amend. XIV, § 1).  The "prototypical equal protection claim involves discrimination against people based on their membership in a vulnerable class."  *Harlen Assocs. v. Incorporated Village of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001).  As relevant here, the Second Circuit has held that gays and lesbians are a "quasi-suspect" class, and classifications based on sexual orientation are subject to "heightened scrutiny."  *Windsor v. United States*, 699 F.3d 169, 185 (2d Cir. 2012), *aff'd*, 570 U.S. 744 (2013).

Typically, an equal protection claim requires a showing that the plaintiff was treated differently than others similarly situated, based on an impermissible consideration such as race, religion, or sexual orientation.  *See Harlen Associates*, 273 F.3d at 499.  However, the Second Circuit held in *Pyke v. Cuomo* that a plaintiff may also establish discrimination in violation of the Equal Protection Clause (in that case on the basis of race) without "show[ing]a better treated, similarly situated group of individuals of a different race" by "pointing to a law that expressly classifies on the basis of race, a facially neutral law or policy that has been applied in an unlawfully discriminatory manner, or a facially neutral policy that has an adverse effect and that was motivated by discriminatory animus."  258 F.3d 107, 110 (2d Cir. 2001).

### 2.    Application

Defendants argue that Plaintiffs' Equal Protection claim must fail because they have failed to adduce any evidence of similarly situated comparators who were treated differently than Plaintiffs.  (Dkt. No. 132-18, pp. 8–11).  Defendants also contend that "the record shows that Ingerson would have reached the same decision regardless of Plaintiffs' sexual orientation."  (*Id.*, p. 14).  In response, Plaintiffs argue that "there is a genuine issue of material fact as to Defendant Ingerson's motivations and intentions when he arrived at the Thousand Islands Inn on the morning of July 2, 2015 - prior to initiating the prosecution of Plaintiff Weinberg and prior to his declaration of the Inn as unsafe and his order that it be vacated and not used."  (Dkt. No. 136, p. 1).  Plaintiffs suggest that "the encounter was a premeditated attack motivated by anti-gay bias." (*Id.*).  Plaintiffs point to allegations by Sullins that Ingerson "did not speak kindly" of Weinberg being gay, once referred to Weinberg as a "fudge packer," and "routinely made comments about gay people who had entered their offices."  (*Id.*, p. 3).

As the Court previously recognized, Plaintiffs' equal protection claim alleges that Ingerson applied facially neutral laws against them in an unlawful discriminatory manner. Therefore, pursuant to *Pyke v. Cuomo*, Plaintiffs need not establish that similarly situated comparators were treated differently.[2]  Rather, in order to substantiate their claim, Plaintiffs must adduce evidence to permit a reasonable inference that Ingerson's actions were motivated by Plaintiffs' sexual orientation.  Here Plaintiffs fall short.  Although there are some secondhand allegations that Ingerson made derogatory comments about gay people and Weinberg, there is no evidence directly connecting these comments to Ingerson's actions against Plaintiffs.[3]  For example, even assuming that Ingerson once called Weinberg a "fudge packer" behind his back, it is a far leap from this stray remark to find that Ingerson was motivated by anti-gay animus when he issued Weinberg a Letter of Violation and an Appearance Ticket and posted a Notice stating that the Inn was unsafe for occupancy.  Any possible link is attenuated by the fact that Ingerson had previously granted Plaintiffs a temporary certificate of occupancy and supported their request for a variance.  (Dkt. No. 132-6, p. 23; Dkt. No. 132-7, p. 131).

Moreover, the record suggests that the escalating conflict between Ingerson and Plaintiffs in the summer of 2015 stemmed from disagreements about hanging a banner at the Inn and letting the cook sleep there (discussed in detail below), which further undercuts a finding of discriminatory intent.  In sum, viewing the facts in the light most favorable to Plaintiffs, Ingerson may have taken action against them for several reasons, but a reasonable jury could not find

---

[2] To the extent Plaintiffs allege an equal protection claim premised on selective enforcement or selective *prosecution* in connection with the Village's initiation of criminal proceedings, they have failed to identify any similarly situated comparators, meaning that such a claim must fail on summary judgment. *See Pyke*, 258 F.3d 109.

[3] The Court has not considered additional allegations made by Sullins that appear only in Plaintiffs' opposition papers, versus an affidavit from Sullins or other admissible evidence.  (*See* Dkt. No. 136, p. 3).

Plaintiffs' sexual orientation among them.  Accordingly, Plaintiffs' equal protection claim must be dismissed.  *See also Coward v. Town and Village of Harrison*, 665 F. Supp. 2d 281, 305 (S.D.N.Y. 2009) (granting summary judgment against the plaintiff's equal protection claim, where among other things there was "no evidence in the record from which a reasonable jury could conclude" that the defendant's action was motivated by racial discrimination); *Kantha v. Blue*, 262 F. Supp. 2d 90, 108 (S.D.N.Y. 2003) ("in order to survive a motion for summary judgment on an equal protection claim, a plaintiff must come forward with some credible evidence that the defendant's actions were motivated by gender-based animus or ill-will").

### B.     **Procedural Due Process Claims**

Plaintiffs' procedural due process claim alleges that Thousand Islands Inn Holdings, LLC and Thousand Islands Enterprises, LLC were deprived of a property interest in the Inn without sufficient process.  (Dkt. No. 80, pp. 62–74; Dkt. No. 98, pp. 9–12).

### 1.     **Legal Standard**

The procedural component of the Fourteenth Amendment's Due Process Clause applies where there is an alleged deprivation by government action of a constitutionally protected interest without sufficient procedural safeguards, such as notice and a hearing.  *See Zinermon v. Burch*, 494 U.S. 113, 125 (1990).  "The first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty.'"  *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999) (quoting U.S. Const. amend. XIV); *see also Spinelli v. City of New York*, 579 F.3d 160, 168 (2d Cir. 2009) ("To succeed on a claim of procedural due process deprivation under the Fourteenth Amendment—that is, a lack of adequate notice and a meaningful opportunity to be heard—a plaintiff must first establish that state action deprived him of a protected property interest.").  "Property interests that are protected by the Due Process

Clause of the Fourteenth Amendment are not created by that amendment; they are defined by 'existing rules or understandings that stem from an independent source such as state law.'" *Spinelli*, 579 F.3d at 168–69 (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)).

Upon a finding that a deprivation of protected interest took place, the next step is to "see if the State's procedures comport with due process." *American Manufacturers*, 526 U.S. at 59. To determine what process is due, courts must balance the three factors set forth in *Mathews v. Eldridge*: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or  substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."  424 U.S. 319, 335 (1976).

### 2.    Application

Plaintiffs argue that in July 2015 Ingerson and the Village deprived Thousand Islands Inn Holdings, LLC, of its property right to use and operate the Inn when they deemed the structure (other than the kitchen) "unsafe," ordered that the structure (other than the kitchen) not to be used or occupied for any purpose besides construction, threatened legal action against any person who violated the order, and commenced legal action against Weinberg for violating the order. (Dkt. No. 131-34, pp. 4–5).  Further, Plaintiffs argue that Defendants "refused to provide the process that was due *under its own law* regarding buildings deemed unsafe, and denied that a hearing would be applicable to any situation other than when a property owner is actually served with an order to repair or demolish a structure."  (*Id.*, p. 6).

On the other hand, Defendants argue that they did not deprive Plaintiffs of any property interest by virtue of their actions on July 13, 2015.  (Dkt. No. 132-18, p. 17).  Defendants

contend that their actions did not affect the part of the Inn that was in use by Plaintiffs—the kitchen area and takeout window.  (*Id.*).  Further, Defendants argue that Plaintiffs were provided with sufficient process.  (*Id.*, pp. 18–21).

First, the Court finds that Plaintiff Thousand Islands Inn Holdings, LLC, which held title to the Inn, had a recognizable property interest in the Inn, including all three floors—which contained rooms for lodging, a restaurant, a bar, and a kitchen.  Second, the record shows that Plaintiff Thousand Islands Inn Holdings, LLC was deprived of most of its property interest when Ingerson and the Village deemed the structure unsafe and ordered it not to be occupied, except for the kitchen.  The question then is whether Thousand Islands Inn Holdings, LLC received sufficient process in connection with this deprivation.  The Court previously recognized that Plaintiffs' due process claim alleges that the deprivation was not random or unauthorized.  (Dkt. No. 98, p. 11).  Therefore, although Plaintiffs did not challenge the deprivation via an Article 78 proceeding, the availability of that remedy is not dispositive of whether Thousand Islands Inn Holdings, LLC received sufficient process.  Rather, the Court must conduct an analysis pursuant to *Mathews v. Eldridge*.

As to the private interest at stake, Plaintiffs argue that Defendants' actions in ordering the Inn vacated and not to be used or occupied "rendered the Inn functionally useless."  (Dkt. No. 131-34, p. 10).  Defendants counter that the impact on Plaintiffs' private interest was minimal, because they were "permitted to continue operating in the same manner as it did prior to the action, i.e., running a take-out window and planning the renovations to the remainder of the building."  (Dkt. No. 132-18).  The answer is no doubt somewhere in between these extremes.  While Plaintiffs had been only using the kitchen to operate a takeout window, there is no dispute

that they owned the entire Inn and intended to reopen it.  Therefore, Defendants' actions significantly limited the private interest of Thousand Islands Inn Holdings, LLC.

Next, the Court must examine the risk of an erroneous deprivation of such interest through the procedures used, and the probable value of additional or substitute safeguards. Defendants' procedures in ordering the Inn vacated and not occupied (except for the kitchen) appeared to follow Section 70-7 of the Village Code, which governs certificates of occupancy and compliance.  On July 2, 2015, following the dispute about the Inn's cook spending the night on the premises, Ingerson issued Weinberg a Letter of Violation and he posted a Notice stating the Inn was unsafe for occupancy.  (Dkt. No. 131-3; Dkt. No. 131-4).  The Notice stated that the Inn was "deemed unsafe" for occupancy, with the exception of the kitchen.  (Dkt. No. 131-3). The Letter ordered Plaintiffs "to vacate any part of the structure other than the kitchen," and that Plaintiffs could only enter the remainder of the Inn for the purpose of repair or construction. (Dkt. No. 131-4).  Plaintiffs argue that Section 70-7 did not afford sufficient process because it "does not make any provision for notice of the deprivation, or an opportunity to be heard with regard to such a deprivation."  (Dkt. No. 131-34, p. 8).  But Defendants contend that Plaintiffs were given verbal notice by Ingerson, and that they had the opportunity to cure the violations and/or challenge the matter via an Article 78 proceeding.  (Dkt. No. 132-18, pp. 18–21).

The Court finds that the very limited pre-deprivation process afforded to Plaintiffs posed a high risk of erroneous deprivation.  "An essential principle of due process is that a deprivation of . . . property be preceded by notice and opportunity for hearing appropriate to the nature of the case," and that the notice "must be reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."  *Chase Grp. All. LLC v. N.Y.C. Dep't of Fin.*, 620 F.3d 146, 150 (2d Cir. 2010)

(internal quotations marks omitted).  Here, Plaintiffs received scant notice—the record shows that on July 2, 2015 Ingerson posted the Inn as unsafe and ordered it not to be occupied, just hours after telling Weinberg that the cook could not sleep there.  (Dkt. No. 132-7, pp. 24, 41).  Ingerson did not provide any written notice before the deprivation, and it is not clear if he cited any specific legal basis, other than alleged "safety reasons."  In contrast, Section 70-9 of the Village Code provides far more robust procedures for when a building is declared unsafe or dangerous to the public.  (Dkt. No. 131-9, pp. 9–10).  As Plaintiffs point out, these procedures include "the making of a written report that the structure is unsafe, notice to the owners, a statement of particulars describing the ways in which the structure is unsafe, an order to repair or demolish, a cure period, and, critically, §70-9(b)(3) allows building owners whose structures have been deemed unsafe to request and obtain a hearing before the Village Board to 'consider the validity of the Code Enforcement Officer's determination.'"  (Dkt. No. 131-14, p. 3).  When Plaintiffs requested such a hearing, the Village declined and denied that Section 70-9 applied to the situation.  (Dkt. No. 131-11; Dkt. No. 131-12).  Arguably, this procedure should have been used to address an allegedly "unsafe" building, and it clearly offers value as an additional or substitute safeguard.[4]

In sum, Plaintiffs received minimal notice or opportunity to be heard before Ingerson ordered the Inn vacated and deemed it unsafe.  A short conversation with Ingerson the same day as the Village's action is not the sort of notice "reasonably calculated to apprise the interested parties of the pending of the action and afford them an opportunity to present their objections."

---

[4] The Court declines to address Plaintiffs' argument that Section 70-7 of the Village Clayton Code is unconstitutional on its face, as this theory was not asserted in the Second Amended Complaint, and moreover, the Court's finding of a due process violation is limited to the *application* of Section 70-7 to the particular facts in this case.

*See Mullane v. C. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950).  As to post-deprivation process, Plaintiffs were denied a hearing with the Village, even though Section 70-9 provided a readily available and straightforward opportunity to address the matter.  Although Plaintiffs could have brought an Article 78 proceeding in State court, this remedy would have likely taken a substantial amount of time and expense while Plaintiffs' rights remained in limbo, and the same is true for other litigation.  *See Panzella v. Sposato*, 863 F.3d 210, 218 (2d Cir. 2017).  Thus, the Court finds that the second *Mathews v. Eldridge* factor supports Plaintiffs' claim.

       As to the government's interest in taking action, Plaintiffs contend that "Defendants did not have a valid public interest at stake when it attempted to force the cook from the building, and when it barred Holdings and 'all persons' from using or occupying the Inn." (Dkt. No. 131-34, p. 11).  Defendants argue that they "had a clear interest in taking the contested action in order to properly ensure the safety of the public." (Dkt. No. 132-18, p. 21).  Defendants point out that there was no electricity to the second and third floors of the Inn and there was an outstanding building permit related to structural concerns. (*Id.*).  According to Defendants, "Plaintiffs' decision to permit their cook to sleep at the Inn invoked Defendants' obligation to assure the safety of the public." (*Id.*).  Although public safety is a paramount concern in government administration, Defendants did not initially explain why the Inn was unsafe.  Indeed, the Inn had apparently operated for decades with structural issues, which Plaintiffs had worked to fix.  This was not an emergency situation (i.e. the impending collapse of a building) that required an immediate response.  Indeed, Defendants declined to use the procedures in Section 70-9 which specifically govern unsafe buildings—calling into question Defendants' justification.  And the Village's interest in avoiding its own Section 70-9 procedures is not particularly significant.

Under these circumstances, the Court finds that the Village did not have a compelling interest in acting without affording Plaintiffs more process.

Balancing the *Mathews v. Eldridge* factors, the Court finds that Plaintiff Thousand Islands Inn Holdings, LLC was deprived of an important property interest in the full use of the Inn, with minimal pre and post deprivation process, and that the Village's interest did not warrant this action. Accordingly, Plaintiff Thousand Islands Inn Holdings, LLC is entitled to summary judgment on its procedural due process claim, as to the liability of Ingerson. The amount of any damages and/or other appropriate relief will have to be determined at trial. *See also First Nat. Acceptance Co. v. City of Utica, N.Y.*, 26 F. Supp. 3d 185, 196 (N.D.N.Y. 2014) (granting the plaintiff summary judgment on procedural due process claim upon finding that the plaintiff "was entitled to notice and an opportunity to be heard before Defendant demolished the building"); *Norton v. Town of Islip*, 239 F. Supp. 2d 264, 273 (E.D.N.Y. 2003) (granting the plaintiff summary judgment on procedural due process claim upon finding that due process "did require the Town to provide Plaintiff with notice and an opportunity to be heard prior to terminating his nonconforming use"), *aff'd*, 77 F. App'x 56 (2d Cir. 2003).

### C.   Municipal Liability Claim

The Court previously found that Plaintiffs stated a due process claim against the Village based on their allegations that "Mayor Zimmer and the Village Board authorized Ingerson to deprive Plaintiffs of their property interests without due process and refused to grant Plaintiffs a hearing to challenge the deprivation." (Dkt. No. 80, pp. 6, 67, 74; Dkt. No. 98, p. 19).

### 1.   Legal Standard

A municipality may be held liable under § 1983 "if the conduct that caused the unconstitutional deprivation was undertaken pursuant to a policy statement, ordinance,

21

regulation, or decision officially adopted and promulgated by that body's officers . . . or pursuant to governmental custom even though such a custom has not received formal approval through the body's official decisionmaking channels." *Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir. 2000) (cleaned up citation) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978)). "The municipality cannot properly be held liable in such an action unless the injury was inflicted by [its] lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Id.* (alteration in original) (internal quotation marks omitted). Further, if the plaintiff does not contend that the challenged actions "were taken pursuant to a local policy that was formally adopted or ratified but rather that they were taken or caused by an official whose actions represent official policy, the court must determine whether that official had final policymaking authority in the particular area involved." *Id.* The Court previously found that "the Village Board has final policymaking authority with regard to enforcement of the Village Code." (Dkt. No. 98, p. 19) (citing Village of Clayton Code § 70-9(B)(3)).

### 2.    Application

Defendants argue that Plaintiffs' claim against the Village must fail because there was no underlying constitutional violation by an individual defendant. (Dkt. No. 132-18, p. 29). However, as discussed above, Plaintiffs have proven liability on their procedural due process claim against Ingerson. And the record shows that the Village fully supported Ingerson's enforcement actions. For example, the Village rejected Plaintiffs' request to hold a hearing regarding Ingerson's actions, and then adopted a resolution that authorized the commencement of criminal and civil actions against Weinberg and Thousand Islands Holdings, LLC. (Dkt. No. 131-12; Dkt. No. 132-7, pp. 242–43). Based on these facts, Plaintiffs have at least raised an issue of fact as to whether Ingerson's actions were the policy of the Village and/or whether the

Village ratified his actions. Therefore, summary judgment is not warranted on Plaintiffs' due process claim against the Village.

### D.   First Amendment Claims

Plaintiffs' First Amendment claims are twofold: 1) that Defendants retaliated against Plaintiffs after Weinberg and Minnick exercised their right to free speech; and 2) that Defendants violated their right to free speech by restricting public comments at Village Board meetings. (Dkt. No. 80, p. 75; Dkt. No. 98, p. 12).

#### 1.   Retaliation

The Court previously recognized that Plaintiffs sufficiently alleged a First Amendment retaliation claim "with respect to the allegation that Ingerson and Zimmer retaliated against Plaintiffs after Weinberg objected to Ingerson's June 2015 order to remove a celebratory banner on the Inn's front porch." (Dkt. No. 98, p. 12). Plaintiffs also allege that Ingerson retaliated against them for expressing the opinion that the cook could stay at the Inn and that any law saying otherwise was "stupid." (Dkt. No. 80, p. 80).

##### a)   Legal Standard

To sustain a First Amendment retaliation claim, a plaintiff must adduce evidence that: (1) the plaintiff's speech or conduct at issue was protected; (2) the defendant took adverse action against the plaintiff; and (3) there was a causal connection between the protected speech and the adverse action. *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009). "A plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action." *Id.* at 129.

### b)       Application

Defendants argue that Plaintiffs' First Amendment retaliation claim must fail because "[t]here is no evidence in the record to support Plaintiffs' claim the underlying litigation was commenced because of the erection of the banner or Weinberg's complaint to Zimmer regarding Ingerson."  (Dkt. No. 132-18, p. 22).  In response, Plaintiffs contend that a reasonable jury could "conclude that the banner incident was a motivating factor for Ingerson to retaliate against Weinberg the next time Weinberg challenged him, on July 2, 2015."  (Dkt. No. 136, p. 12). Specifically, Plaintiffs suggest that Ingerson retaliated in response to Weinberg challenging Ingerson about whether the cook could lawfully stay at the Inn.  (Dkt. No. 131-34, p. 16). Plaintiffs contend that Ingerson retaliated by declaring the Inn unsafe, ordering it vacated, and initiating criminal and civil proceedings against Weinberg.  (*Id.*).

First, there is no dispute that Plaintiffs engaged in protected speech when they: 1) erected the banner; 2) complained to Zimmer about the banner incident; and 3) argued with Ingerson about the cook staying at the Inn.  Second, viewing the facts in the light most favorable to Plaintiffs, Ingerson and the Village took various adverse actions against them, starting with the Notice to Vacate, Letter of Violation, and Appearance Ticket issued on July 2, 2015.  However, the Court finds that Plaintiffs have failed to raise an issue of fact that Ingerson was aware of Weinberg's complaint to Zimmer about the banner incident at the time of the adverse actions. Therefore, this portion of Plaintiffs' retaliation claim must fail.  But Plaintiffs correctly point out that Ingerson's enforcement actions on July 2, 2015 following immediately after the cook dispute earlier that day and not long after the banner dispute on June 15, 2015.  This temporal proximity, coupled with Ingerson's questionable decision to invoke Section 70-7 of the Village Code instead of Section 70-9 (regarding unsafe buildings), could permit a reasonable jury to conclude

that there was a causal connection between the enforcement actions and Plaintiffs' speech, and that Ingerson acted with a retaliatory motive.  Accordingly, Defendants are not entitled to summary judgment on Plaintiffs' First Amendment retaliation claim.[5]

## 2.    Restrictions on Public Comments

The Court previously found that Plaintiffs stated a First Amendment claim based on their allegations that "Zimmer implemented new public comment rules and used the chief of police to selectively silence Plaintiffs' viewpoints."  (Dkt. No. 80, p. 79; Dkt. No. 98, p. 15).

### a)    Legal Standard

The First Amendment of the United States Constitution provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I.  At its core, "the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 95 (1972).  But "the First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981).  To determine "whether a state actor violated a plaintiff's First Amendment right to free speech," courts follow "a three-step, forum-based test." *Wandering Dago Inc. v. N.Y. State Office of Gen. Servs.*, 992 F. Supp. 2d 102, 115 (N.D.N.Y. 2014).  First, they examine "whether plaintiff's speech is protected by the First Amendment"; second, they determine "the nature of the forum: public, designated or limited public, or nonpublic"; and third, they analyze "whether the defendant's justifications for limiting the

---

[5] To the extent Plaintiffs argue that Mayor Zimmer participated in these enforcement actions, they have failed to raise an issue of fact that she was personally involved in the decision to issue the Notice to Vacate, Letter of Violation, or Appearance Ticket, which were all drafted and signed by Ingerson. (Dkt. No. 131-3, Dkt. No. 131-4, Dkt. No. 131-5).  Further, the Court has previously found that Mayor Zimmer and the Village Board are entitled to prosecutorial immunity for their ratification of the legal proceedings against Plaintiffs.  (Dkt. No. 79, p. 31).

plaintiff's speech satisfy the requisite standard." *Id.* (quoting *Piscottano v. Town of Somers*, 396 F. Supp. 2d 187, 200 (D. Conn. 2005)).

"Reasonable time, place and manner restrictions on speech in limited public fora comport with the Constitution so long as they are content-neutral, serve a significant government interest and leave open alternative channels for expression." *Brenchley v. Village of Phoenix*, No. 01-cv-190, 2005 WL 2437027, at *3, 2005 U.S. Dist. LEXIS 48212, at *9–10 (N.D.N.Y. Sept. 30, 2005). In a limited public forum, discussion of certain topics is permissibly limited as long as the exclusion is viewpoint neutral and reasonable. *See Smith v. City of Middletown*, No. 09-cv-1431, 2011 WL 3859738, at *5, 2011 U.S. Dist. LEXIS 98601, at *10–12 (D. Conn. Sept. 1, 2011), *aff'd sub nom. Smith v. Santangelo*, 518 F. App'x 16 (2d Cir. 2013) ("In a limited public forum, 'a government entity may impose restrictions on speech that are reasonable and viewpoint-neutral.'") (quoting *Pleasant Grove City v. Summum*, 555 U.S. 460, 470 (2009)).

**b)   Application**

Plaintiffs contend that the rules prohibiting public comment about the Inn litigation and litigation in general "are impermissible content-based restrictions." (Dkt. No. 131-34, p. 26). Additionally, Plaintiffs contend that the rules constitute retaliation in response to Minnick's protected speech. (*Id.*, p. 27). In contrast, Defendants argue that the changes to the public comment rules did not violate the First Amendment because they were viewpoint neutral and reasonable. (Dkt. No. 132-18, pp. 24–25). Defendants also contend that the rules were enforced not because of the content of Plaintiffs' speech, but because of Minnick's "disruptive behavior." (*Id.*, p. 27).

First, the Court finds that the Village Board meeting is a limited public forum, and therefore, the rules must be viewpoint neutral and reasonable. *See Devine v. Village of Port*

*Jefferson*, 849 F. Supp. 185, 189 (E.D.N.Y. 1994).  A rule is viewpoint neutral if it is "based only upon the manner in which speakers transmit their messages to viewers, and not upon the messages they carry." *Turner Broadcasting Systems. Inc. v. F.C.C.*, 512 U.S. 622, 645 (1994). Here, the Court finds that the rules prohibiting public comment on litigation are viewpoint neutral because they do not selectively silence any particular view or message regarding the Inn situation, but rather bar any discussion of the matter.  *See Velazquez v. Leg. Services Corp.*, 164 F.3d 757, 768 (2d Cir. 1999), *aff'd*, 531 U.S. 533 (2001) (finding that prohibition against litigation was viewpoint neutral because litigation "by definition has at least two sides").  The Court also finds that the rules are reasonable because a Village Board meeting is not an apt place to discuss pending litigation—which has its own special rules and forum.  And as Defendants point out, "[a] village has a significant interest in conducting its meeting in an orderly and effective fashion." (Dkt. No. 132-18, p. 26).  Therefore, Plaintiffs' First Amendment claim related to the rules prohibiting discussion of litigation must be dismissed.

Second, the Court previously found that legislative immunity "attaches to the modification of the public comment rules (but not to their enforcement)."  (Dkt. No. 79, p. 31). Thus, Plaintiffs' claim that the rules were enacted as retaliation must fail.  As to enforcement of the rules, Plaintiffs argue that Mayor Zimmer retaliated against Minnick when he spoke about the Inn situation at the June 13, 2016 Village Board Meeting by: 1) telling him to stop talking about the litigation; and 2) asking the Chief of Police to rise to silence him.  (Dkt. No. 131-34, p. 27).  In response, Defendants contend that Minnick was allowed to speak about the litigation, and that "it was only after Minnick spoke for five minutes and refused to stop speaking that Zimmer requested Chief Patenaude intervene."  (Dkt. No. 132-18, p. 27).

Upon review of the record, the Court finds that Plaintiffs have failed to raise an issue of fact that Mayor Zimmer retaliated in response to Minnick's speech at the June 13, 2016 meeting. First, Minnick testified that Mayor Zimmer interrupted him "as soon as my five minutes was up," not when she heard the content of his speech. (Dkt. No. 132-2, p. 101). The Village Board had previously adopted the five-minute rule in February of 2016. (Dkt. No. 132-16, p. 33). There is also no dispute that Minnick violated the five-minute rule and continued speaking, and it was only then that Mayor Zimmer asked the Chief of Police to rise. (Dkt. No. 132-2, p. 101). Based on these facts, no reasonable jury could find that the content of Minnick's speech was the but-for cause of Mayor Zimmer's actions. Therefore, Plaintiffs' retaliation claim against Mayor Zimmer must fail. *See also Nieves v. Bartlett*, ___U.S.___, 139 S. Ct. 1715, 1722 (2019) ("It is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must *cause* the injury. Specifically, it must be a but-for cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive.") (internal quotation and citation omitted).

### E.    Qualified Immunity

Next, Defendants argue that Plaintiffs' claims against Ingerson must fail because he is shielded by the doctrine of qualified immunity. (Dkt. No. 132-18, p. 28; Dkt. No. 135, p. 28). Plaintiffs disagree. (Dkt. No. 136, p. 13).

#### 1.    Legal Standard

"Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, ___U.S.___, 137 S. Ct. 548, 551 (2017) (per curiam) (internal quotation marks omitted). "Qualified immunity protects public officials from liability for civil damages when

one of two conditions is satisfied: (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Garcia v. Does*, 779 F.3d 84, 92 (quoting *Russo v. City of Bridgeport*, 479 F.3d 196, 211 (2d Cir. 2007)); *see also Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Where the relevant facts are not in dispute, the Court can decide qualified immunity as a matter of law. *See Warren v. Dwyer*, 906 F.2d 70, 76 (2d Cir. 1990).

"Though the qualified immunity inquiry is generally an objective one, a defendant's subjective intent is indeed relevant in motive-based constitutional torts." *Johnson v. Ganim*, 342 F.3d 105, 117 (2d Cir. 2003).  "Otherwise, defendants in such cases would always be immunized from liability so long as they could point to objective evidence showing that a reasonable official could have acted on legitimate grounds." *Id.*  "Where a factual issue exists on the issue of motive or intent, a defendant's motion for summary judgment on the basis of qualified immunity must fail." *Id.* (citing *Locurto v. Safir*, 264 F.3d 154, 170 (2d Cir. 2001)); *see also Sheppard v. Beerman*, 94 F.3d 823, 828 (2d Cir. 1996) (stating that "the employer's actual (subjective) motive is *not* irrelevant in a qualified immunity inquiry" on a First Amendment retaliation claim) (emphasis in original).

## 2.    Application

First, the Court finds that Ingerson is not entitled to qualified immunity on Plaintiffs' due process claim.  As discussed above, Ingerson's enforcement actions violated the due process rights of Plaintiff Thousand Islands Inn Holdings, LLC.  Therefore, Ingerson's actions violated clearly established law.  Moreover, it was not objectively reasonable for Ingerson to believe that his actions did not violate clearly established law—because he provided barely any notice or opportunity to be heard before declaring the Inn unsafe and ordering it vacated, while avoiding

the procedures governing "unsafe" buildings.  Similarly, Ingerson is not entitled to qualified

immunity on Plaintiffs' retaliation claim at this juncture because, assuming that his enforcement

actions were motivated by Plaintiffs' speech, he violated clearly established law and could not

have reasonably believed otherwise.[6]  *See Nagle v. Marron*, 663 F.3d 100, 115 (2d Cir. 2011)

(finding that qualified immunity did not apply where school officials "knew or should have

known that retaliation for protected speech would violate an employee's First Amendment

rights"); *Velez v. Levy*, 401 F.3d 75, 102 (2d Cir. 2005) ("Accordingly, if it is true, as asserted by

Velez, that Levy acted deliberately to bring about Velez's removal in retaliation for her political

views, he cannot avail himself of qualified immunity."); *DePace v. Flaherty*, 183 F. Supp. 2d

633, 642 (S.D.N.Y. 2002) ("It would have been objectively unreasonable for Flaherty to believe

that adverse employment action against and unequal treatment of an employee who exercised his

First Amendment rights was permissible.").

## F.    Punitive Damages

Finally, Defendants argue that the Court should strike Plaintiffs' claim for punitive

damages because "Ingerson and Zimmer's actions were not taken with malice, nor was their

conduct so flagrant as to transcend mere carelessness."  (Dkt. No. 132-18, p. 30).  Plaintiffs

contend that the motivation of Defendants is "quintessentially a question for a finder of fact."

(Dkt. No. 136, p. 21).

"Punitive damages may be awarded when the plaintiff has shown that defendant's

conduct was motivated by evil motive or intent, or when it involves callous indifference to

---

[6] Assuming *arguendo* that Plaintiffs raised an issue of fact as to their retaliation claim against Mayor
Zimmer, the Court finds that she would be entitled to qualified immunity because it was objectively
reasonable for her to believe that enforcing the five-minute rule at the Village Board meeting did not
violate Plaintiffs' clearly established rights.

federally protected rights of others." *Picciano v. McLoughlin*, 723 F. Supp. 2d 491, 506 (N.D.N.Y. 2010 (internal quotations and citations omitted).  "Generally, the issue of whether to award punitive damages is an issue for the jury to decide based on an evaluation of the plaintiff's proof of sufficiently serious misconduct." *Id.*

In this case, Plaintiffs have raised an issue of fact regarding Ingerson's motive in taking enforcement action against them.  Therefore, the Court denies Defendants' motion for summary judgment on the issue of punitive damages against Ingerson.  However, Plaintiffs are not entitled to punitive damages against Mayor Zimmer because the claims against her have been dismissed. And lastly, Plaintiffs cannot seek punitive damages against the Village in this case because municipalities are exempt from punitive damages.  *See Dzwonczyk v. Syracuse City Police Dept.*, 710 F. Supp. 2d 248, 271 (N.D.N.Y. 2008).

V.     **CONCLUSION**

For these reasons, it is

**ORDERED** that Plaintiffs' Motion for Partial Summary Judgment (Dkt. No. 131) is **GRANTED as to Plaintiffs' Procedural Due Process claim against Defendant Ingerson, and otherwise DENIED; and it is further**

**ORDERED** that the Defendants' Motion for Summary Judgment (Dkt. No. 132) is **GRANTED in part and DENIED in part**; and it is further

**ORDERED** that the following claims are dismissed with prejudice: 1) Plaintiffs' Equal Protection claim against Defendant Ingerson; 2) Plaintiffs' claims against Defendant Zimmer; and 3) Plaintiffs' claims regarding the Village Board's meeting rules; and it is further

**ORDERED** that the Clerk of the Court shall coordinate with the parties to schedule a trial on the following claims: 1) Procedural Due Process claim against Defendants Ingerson and the Village; and 2) First Amendment Retaliation against Defendant Ingerson; and it is further

**ORDERED** that the Clerk of the Court is directed to provide a copy of this Memorandum-Decision and Order to the parties in accordance with the Local Rules of the Northern District of New York.

**IT IS SO ORDERED.**

April 29, 2021
Syracuse, New York

Norman A. Mordue
Senior U.S. District Judge